# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued January 22, 2007          Decided March 23, 2007

No. 05-1455

LISA JOCHIMS,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

WILSHIRE AT LAKEWOOD,
INTERVENOR

On Petition for Review of an Order of the
National Labor Relations Board

*Harold Craig Becker* argued the cause and filed the briefs for petitioner.

*Daniel A. Blitz*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Aileen A. Armstrong*, Deputy Associate General Counsel, and *Meredith L. Jason*, Supervisory Attorney.

*Jeffrey M. Place* was on the brief for intervenor.

Before: ROGERS and KAVANAUGH, *Circuit Judges*, and EDWARDS, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* EDWARDS.

EDWARDS, *Senior Circuit Judge*: The petition for review in this case was filed by Lisa Jochims, a registered nurse who was formerly employed by Wilshire at Lakewood ("Wilshire"), a long-term care facility. In 2002, petitioner filed an unfair labor practice charge with the National Labor Relations Board ("NLRB" or "Board"), asserting that she had been unlawfully discharged by Wilshire for engaging in protected activities. The Board's General Counsel issued a complaint, alleging that Wilshire's dismissal of petitioner was an unfair labor practice in violation of § 8(a)(1) of the National Labor Relations Act ("Act"), 29 U.S.C. § 158(a)(1). The matter was then heard by an Administrative Law Judge ("ALJ"), who concluded that petitioner was a "supervisor" within the meaning of § 2(11) of the Act, 29 U.S.C. § 152(11), and therefore unprotected by the Act. On September 30, 2004, the Board issued its initial decision, holding that Jochims was not a supervisor and that her discharge violated the Act. *Wilshire at Lakewood*, 343 N.L.R.B. No. 23, 2004 WL 2235906 (Sept. 30, 2004) ("*Initial Decision*"), *reprinted in* Deferred Appendix ("App.") at 263-79. On September 30, 2005, after reconsideration, the Board issued a Supplemental Decision and Order, holding that Jochims was a supervisor under the Act and, therefore, that her dismissal was not an unfair labor practice. *Wilshire at Lakewood*, 345 N.L.R.B. No. 80, 2005 WL 2451996 (Sept. 30, 2005) ("*Supplemental Decision*"), *reprinted in* App. at 280-86. Jochims then petitioned for review in this court.

In concluding that petitioner was a supervisor, the Board first explained that it was "unnecessary to pass" on the question of whether Jochims had the authority "responsibly to direct" employees, 29 U.S.C. § 152(11), pursuant to the Court's decision in *NLRB v. Kentucky River Community Care, Inc.*, 532 U.S. 706 (2001). Rather, the Board found that petitioner

"possessed supervisory authority apart from the issue of her responsible direction of employees." *Supplemental Decision,* 345 N.L.R.B. No. 80, slip op. at 1. The Board then cited four factors upon which it rested its finding that petitioner was a supervisor: (1) petitioner completed written reports concerning employee misconduct; (2) petitioner sent two employees home for gross misconduct after receiving directions from management to do so; (3) petitioner permitted two employees to leave work early to attend to family emergencies; and (4) petitioner completed part of one evaluation of a probationary employee. As petitioner points out, there are blatant flaws in the Board's decision. First, "Jochims' completion of the written reports of misconduct was not itself discipline." Petitioner's Br. at 6. Furthermore, "[t]he Board expressly found that Jochims sent two employee[s] home after observing obvious, gross misconduct, only after being instructed to do so by [management.]" *Id*. at 6-7. Moreover, Jochims did not exercise independent judgment when she permitted two employees to leave work early when their children were involved in medical emergencies. *Id.* at 7. And, finally, there is "a long line of prior Board precedent holding that evaluation alone, not leading automatically to reward or punishment, is not evidence of supervisory status." *Id*. at 8. The record clearly supports petitioner's contentions.

The Board's brief to this court argues that, because Wilshire followed a "Progressive Disciplinary Action" system, codified in an "Employee Handbook," petitioner's written reports on employee misconduct must have constituted effective recommendations of discipline, and that this demonstrates that she was a supervisor. This argument is nothing more than *post hoc* rationalization. The Board never purported to rest on any alleged system of "progressive discipline" in holding that petitioner was a supervisor, and the Employee Handbook is never even mentioned in the Board's Supplemental Decision.

A Board decision must be set aside when, as here, it departs from established precedent and the judgment is not supported by substantial evidence. On the record here, it is plain that, in holding that petitioner was a supervisor under the Act, the Board completely deviated from its own precedent and issued a judgment that is devoid of substantial evidence. We therefore reverse the Board's Supplemental Decision, grant the petition for review, and remand the case to the Board.

## I. BACKGROUND

### A. *The Facts*

The facts have been thoroughly detailed in the *Supplemental Decision* and *Initial Decision*, so there is no reason for us to repeat all of the facts here. Rather, we will merely recite notable portions of the Board's statement of facts and briefly summarize other facts relevant to our disposition of the petition for review. The parties do not dispute that, if petitioner was an "employee," rather than a "supervisor," Wilshire undeniably committed an unfair labor practice in dismissing her for engaging in protected activities. *Initial Decision*, 343 N.L.R.B. No. 23, slip op. at 1 n.4. Therefore, our principal focus here is on the facts that determine whether the Board erred in holding that petitioner was a supervisor.

\* \* \* \*

Wilshire is a long-term care nursing home providing residential and skilled nursing care to its residents and patients. During the period relevant to this case, Wilshire employed between 110 and 120 employees, who were variously assigned to work in four halls. The nursing staff included charge nurses, registered nurses ("RNs"), licensed practical nurses ("LPNs"), and certified nursing assistants ("CNAs"). CNAs typically assisted patients with the basic needs of daily living such as eating, bathing, dressing, and assistance with the toilet. RNs and LPNs, who are highly skilled professional nurses, were

responsible for providing more advanced and specialized care. And charge nurses, typically RNs or LPNs, carried the responsibility for the oversight of the CNAs assigned to a particular hall and the overall care of the patients who were in residence.

Wilshire hired petitioner in August 1999. She worked at the nursing home facility until February 2002, when Wilshire fired her for circulating a petition protesting the employer's proposed plan for "role reversal" assignments. Under the proposed plan, RNs and LPNs would occasionally perform the duties of CNAs. Before her dismissal,

> [t]he record shows that Jochims, the [employer's] "weekend supervisor," was primarily involved with patient care and interaction with patients' families. In addition, Jochims attended management meetings and was paid more than the [employer's] charge nurses. Although Jochims was the highest ranking employee at the facility on the weekend, the [employer] provided the weekend staff with the telephone numbers of various managers to contact in case of an emergency.

> The record further shows that Jochims would check to see whether employees did their tasks correctly, and could correct employees if they did something wrong. If there was a gross infraction of residential care, Jochims – as well as other nursing employees not alleged to be supervisors – could write up the employee on a disciplinary form. Jochims decided whether to document an employee's infraction on the disciplinary form. If she did so, the completed disciplinary form would be subsequently reviewed by the [employer's] managerial officials – Administrator Jim Harralson or Director of Nursing Wendy Gibson. They would determine whether the infraction warranted disciplinary action.

On two occasions, Jochims made an oral report that an employee was unfit for work. On one occasion, Jochims called the [employer's] administrator, Jim Harralson, and reported that a licensed practical nurse (LPN) had come to work intoxicated. On the other occasion, Jochims told the [employer's] assistant director of nursing, Sheila Littrell, that a certified nursing assistant (CNA) was taking extended breaks and was failing to respond to patient call lights. In both instances, Jochims was instructed to send the employee home.

In addition, on two occasions, employees came to Jochims and expressed a need to leave work early because of severe health problems experienced by their young children. On both occasions, Jochims – without first checking with her superiors – told the employees to leave work early.

The record also reveals that, on one occasion, Jochims prepared a performance evaluation of one employee. In this particular circumstance, the [employer's] director of nursing, Wendy Gibson, asked Jochims to fill out an employee's 90-day evaluation, because Gibson was not familiar with that employee. Jochims complied with Gibson's directive, and filled out the portions of the evaluation form that reflected her own observations of that employee. Jochims also signed the evaluation.

*Initial Decision*, 343 N.L.R.B. No. 23, slip op. at 2. The Board did not modify these findings in its *Supplemental Decision*.

On February 1, 2002, responding to complaints by CNAs who were assigned to work on weekends, Gibson and the nursing home's Administrator, Jim Harralson, called a meeting of the RNs and LPNs. Petitioner, who was working the weekend shift, attended the meeting. Apparently, because the CNAs had voiced concerns with management that they were not

adequately supported by the nurses, the purpose of the meeting was to announce that management was considering the implementation of the role-reversal plan. Following the meeting, petitioner circulated a petition among the nurses to garner support in protest of management's plan to have them "work the floor." The assistant director of nursing learned of the petition and reported her discovery to Gibson on February 18, 2002. Gibson informed Harralson of the petition and Harralson instructed her to call petitioner at home and ask her to bring the petition to work. After obtaining and reviewing the petition, Harralson and Gibson consulted and decided to fire petitioner, which they did on Friday, February 22, 2002. On the same day, Harralson and Gibson called a meeting of the nurses on duty and informed them that no final decision had been made concerning the role-reversal plan. Harralson expressed displeasure that the nurses apparently were unwilling to assist the CNAs and stated that he was disappointed that those nurses who signed the petition did not first come to him with their complaints.

## B. *Proceedings Below*

Petitioner filed her original unfair labor practice charge with the Board on February 25, 2002, and amended the charge on April 9, 2002, and again on April 15, 2002. In response to petitioner's filings, the Board's General Counsel filed a complaint against Wilshire on April 9, 2002, and an amended complaint on April 15, 2002, alleging that the employer had violated § 8(a)(1) of the Act. The matter was heard by an ALJ, who concluded that Wilshire engaged in certain unfair labor practices by interrogating employees about the Jochims petition and creating an impression that protected activities were under surveillance. However, the ALJ rejected petitioner's claims, finding her to be "a statutory supervisor at the time that she circulated the petition regarding nurses working the floor." *Initial Decision*, 343 N.L.R.B. No. 23, slip op. at 12.

In its *Initial Decision*, the Board adopted the ALJ's finding that Wilshire violated § 8(a)(1) by interrogating employees and creating the impression that it was monitoring protected activities. However, the Board rejected the ALJ's determination that petitioner was a statutory supervisor and, to the contrary, found the record insufficient to show that petitioner possessed "the requisite authority to establish that she [was] a supervisor within the meaning of Section 2(11) of the Act." *Id.* at 4. In a 2-1 decision, the Board found that Wilshire violated the Act by firing petitioner, an employee covered by the Act, for engaging in protected activity. Wilshire appealed the *Initial Decision* to the United States Court of Appeals for the Eighth Circuit.

Before the *Initial Decision* could be reviewed by the Eighth Circuit, the Board decided, *sua sponte*, to reconsider the complaint. Upon reconsideration, a new panel of the Board issued a *Supplemental Decision* in which it held that petitioner was a "supervisor" under the Act. The Board relied solely on four factors in determining that petitioner was a supervisor:

> "[I]f Jochims determined that an employee committed a gross infraction of residential care, she could, at her discretion, document the infraction on a disciplinary form. This disciplinary writeup would initiate further review by managerial officials, as well as a determination of whether further disciplinary action against the employee was warranted." *Supplemental Decision*, 345 N.L.R.B. No. 80, slip op. at 1.

> "[O]n at least two occasions, Jochims orally reported that an employee was unfit for work. In one of these instances, Jochims reported to the Respondent's Administrator that a licensed practical nurse came to work intoxicated, and in the other instance she reported to the director of nursing that a certified nursing assistant was taking extended breaks and was failing to respond to patient call lights. In each of these discussions with the

management officials, the decision was made by the administrator to send these employees home, and Jochims instructed the offending employees to leave." *Id*. at 1-2.

"On two occasions, Jochims was presented with an employee request to leave before the end of the shift to attend to a family emergency. In both instances, Jochims independently granted the requests." *Id*. at 2.

"Jochims also evaluated an employee's performance." *Id*.

The Board then concluded: "In view of the above facts, we find, contrary to the Board's original decision, that Jochims possessed supervisory authority within the meaning of Section 2(11) of the Act." *Id.* Petitioner now seeks review and reversal of the *Supplemental Decision*.

## II. ANALYSIS

### A. *Standard of Review*

"Judicial review of NLRB determinations in unfair labor practice cases is generally limited, but not so deferential that the court will merely act as a rubber stamp for the Board's conclusions." *Titanium Metals Corp. v. NLRB*, 392 F.3d 439, 445 (D.C. Cir. 2004). A Board order will not survive review when its factual determinations are not supported by substantial evidence. *See Allentown Mack Sales & Serv., Inc. v. NLRB*, 522 U.S. 359, 361 (1998). A Board's decision will also be set aside when it has no reasonable basis in law, fails to apply the proper legal standards, or departs from established precedent without reasoned justification. *Titanium Metals Corp*., 392 F.3d at 446.

At bottom, a reviewing court will uphold a Board decision only if it is "rational and consistent with the Act," and so long as the Board's reasoning is not "inadequate, irrational, or arbitrary." *Allentown Mack*, 522 U.S. at 364 (internal citations and quotation marks omitted). In other words, we must uphold

the judgment of the Board unless, upon reviewing the record as a whole, we conclude that the Board's findings are not supported by "substantial evidence," 29 U.S.C. § 160(f), or that "the Board acted arbitrarily or otherwise erred in applying established law to the facts of the case." *Int'l Union of Electronic, Electrical, Salaried, Mach. & Furniture Workers v. NLRB*, 41 F.3d 1532, 1536 (D.C. Cir. 1994) (internal quotation marks omitted). For the reasons stated below, we conclude that the Board's *Supplemental Decision* is fatally flawed, because the Board misapplied its own precedent and issued a judgment that is devoid of substantial evidence.

**B.** *The Meaning of "Supervisor" Under the Act*

Section 2 of the Act, 29 U.S.C. § 152, defines "employee" specifically to exclude "any individual employed as a supervisor," *id.* § 152(3), and defines a supervisor as "any individual having authority, in the interest of the employer, to hire, transfer, suspend, lay off, recall, promote, discharge, assign, reward, or discipline other employees, or responsibly to direct them, or to adjust their grievances, or effectively to recommend such action," *id.* § 152(11). In order to be considered a supervisor under the Act, an individual "must possess at least one of the twelve types of authority set out in the statute," *VIP Health Servs., Inc. v. NLRB*, 164 F.3d 644, 648 (D.C. Cir. 1999), *and* "the exercise of such authority [cannot be] of a merely routine or clerical nature, but requires the use of independent judgment," 29 U.S.C. § 152(11). As the Supreme Court has noted:

> The text of § 2(11) . . . sets forth a three-part test for determining supervisory status. Employees are statutory supervisors if (1) they hold the authority to engage in any 1 of the 12 listed supervisory functions, (2) their "exercise of such authority is not of a merely routine or clerical nature, but requires the use of independent judgment," and (3) their authority is held "in the interest of the employer."

*NLRB v. Ky. River Cmty. Care, Inc.*, 532 U.S. 706, 712-13 (2001) (quoting *NLRB v. Health Care & Ret. Corp. of Am.*, 511 U.S. 571, 573-74 (1994)).

"Because the issue of supervisory status is heavily fact-dependent and job duties vary, *per se* rules designating certain classes of jobs as always or never supervisory are generally inappropriate." *Brusco Tug & Barge Co. v. NLRB*, 247 F.3d 273, 276 (D.C. Cir. 2001). Moreover, "[b]ecause of the serious consequences of an erroneous determination of supervisory status, particular caution is warranted before concluding that a worker is a supervisor despite the fact that the purported supervisory authority has not been exercised." *Beverly Enters.-Mass., Inc. v. NLRB*, 165 F.3d 960, 963 (D.C. Cir. 1999). In other words, supervisory authority is not conferred on an employee merely by vesting her with a title. If an employee has not actually exercised supervisory authority, "there must be other affirmative indications of authority. Statements by management purporting to confer authority do not alone suffice." *Id*. Finally, the burden of proving supervisory status rests on the party who asserts it. *Ky. River Cmty. Care*, 532 U.S. at 710-12.

## C. *What This Case Is Not About*

Before reviewing the Board's *Supplemental Decision*, it is important to be clear on what this case is not about. First, the Board's decision in this case does not rest on the Supreme Court's decision in *Kentucky River Community Care*. In that case, the Board argued that, in applying the three-part test for determining supervisory status under the Act, employees cannot be seen to use "independent judgment" when they exercise "ordinary professional or technical judgment in directing less-skilled employees to deliver services in accordance with employer-specified standards." 532 U.S. at 713. The Supreme Court rejected this interpretation of § 2(11), insofar as it suggested that "the judgment even of employees who are

permitted by their employer to exercise a sufficient *degree* of discretion is not independent judgment if it is a particular *kind* of judgment, namely, ordinary professional or technical judgment in directing less-skilled employees to deliver services." *Id*. at 714 (internal quotation marks omitted).

In its *Initial Decision* in this case, the Board stated:

Jochims also testified that employees would come to her with complaints or problems, and she would "counsel them" and give "some direction on how to handle the situation." This evidence of authority to "correct" is, however, insufficient to satisfy the Respondent's burden to show that Jochims exercised independent judgment to responsibly direct employees in the performance of their duties, as required by Section 2(11).[FN 6]

[FN 6] Thus, we find that supervisory status has not been established under any interpretation of *NLRB v. Kentucky River Community Care* . . . .

*Initial Decision*, 343 N.L.R.B. No. 23, slip op. at 2. In its *Supplemental Decision*, however, the Board expressly retreated from any discussion of or reliance on *NLRB v. Kentucky River Community Care*:

At the outset, we note that the Board's original decision found the record evidence insufficient to establish that Jochims exercised independent judgment to responsibly direct employees "under any interpretation of *NLRB v. Kentucky River Community Care*," 532 U.S. 706 (2001). We recognize that this finding, without further explanation, could raise a substantial issue . . . as to whether there is a clearly articulated rationale for the finding that Jochims is not a supervisor. However, after reconsidering the record, we find it unnecessary to pass on that issue, because we find, as explained below, that Jochims possessed

supervisory authority apart from the issue of her responsible direction of employees.

*Supplemental Decision*, 345 N.L.R.B. No. 80, slip op. at 1 (internal citation omitted). It is therefore clear that the Board's holding that petitioner was a supervisor does not rest on a determination that Jochims had the authority to "responsibly direct" other employees "in the interest of the employer." During oral argument, Board counsel confirmed that the NLRB's position did not rest on the "responsibly direct" portion of § 2(11) of the Act.

Second, this case is not about petitioner's involvement in a "system" of progressive discipline. As noted above, the Board's brief to this court argues that petitioner's written reports on employee misconduct constituted the first step in Wilshire's "Progressive Disciplinary Action" system which is described in an "Employee Handbook." This, according to Board counsel, confirms that petitioner was a supervisor. This is a specious argument. The Board's *Supplemental Decision* nowhere concludes that petitioner acted pursuant to a Progressive Disciplinary Action system; nor does the Board's decision even mention an Employee Handbook in support of its holding that petitioner was a supervisor. The progressive discipline/employee handbook argument is nothing more than counsel's *post hoc* rationalization, which of course we will not credit in our review of the Board's *Supplemental Decision. See Point Park Univ. v. NLRB*, 457 F.3d 42, 50 (D.C. Cir. 2006) ("We can only look to the Board's stated rationale. We cannot sustain its action on some other basis the Board did not mention.").

**D.** *The Board's Flawed Supplemental Decision*

In justifying its holding that petitioner was a supervisor, the Board relied solely on four factors. As we show below, under clearly established case law and agency precedent, none of these factors supports a finding of supervisory status under the Act. Absent this factual support, there is nothing to justify the conclusion reached in the Board's *Supplemental Decision*. In other words, the Board's judgment lacks both reasoned decisionmaking and substantial evidence.

1. *Preparing Written Reports Concerning Employee Misconduct*

It is undisputed that petitioner had the authority to "write up" employees who violated work rules. The record indicates that, on nine occasions, petitioner completed forms – variously described as "Employee Incident/Accident Report," "Employee Counseling Form," or "Employee Disciplinary Form" – detailing employee misdeeds. These forms reported such transgressions as failing to complete patient treatments, arriving late to work, and sleeping on duty. Petitioner signed the forms as "supervisor" or "immediate supervisor." Whenever petitioner completed a form, it was placed in the employee's personnel file. The writeups were not considered to be discipline. Rather, as the Board found, a writeup might later be used for "possible discipline." *Supplemental Decision*, 345 N.L.R.B. No. 80, slip op. at 2.

In support of its claim that petitioner's authority to write up employees is proof that she had the "discretion to initiate the disciplinary process against an employee," the Board advances a strange argument: "[I]f Jochims exercised her discretion not to write up an employee, there would be no discipline against that employee." Board's Br. at 27. There is absolutely nothing in the record to support this assertion. Indeed, at oral argument, counsel acknowledged that an employee could be disciplined by

management whether or not petitioner had submitted a writeup. Furthermore, there is nothing to indicate that petitioner's writeups were deemed final and authoritative by management. A decision to discipline an employee rested with Wilshire management, not with petitioner.

The case law makes it clear that petitioner's bare authority as a charging nurse to write up employee infractions cannot, without more, be viewed as creditable evidence of supervisory status:

> [T]he issuance of written warnings that do not alone affect job status or tenure do not constitute supervisory authority.
>
> . . . .
>
> [F]or the issuance of reprimands or warnings to constitute statutory supervisory authority, the warning must not only initiate, or be considered in determining future disciplinary action, but also it must be the basis of later personnel action without independent investigation or review by other supervisors.

*Phelps Cmty. Med. Ctr.*, 295 N.L.R.B. 486, 490 (1989) (citation omitted). A long line of Board precedent, dealing specifically with nursing homes, establishes that written reprimands do not, in and of themselves, constitute discipline or serve as evidence of supervisory authority. *See, e.g.*, *Ohio Masonic Home*, 295 N.L.R.B. 390, 393 (1989) ("Although these documents are placed in an employee's personnel file, the record does not establish that these warnings automatically lead to any further discipline or adverse action against an employee."); *Hausner Hard-Chrome of Ky., Inc.*, 326 N.L.R.B. 426, 427 (1998) (holding that written reprimands do not constitute disciplinary authority where the "actual disciplinary action" was taken by an administrator and the record contained no evidence that "job affecting discipline (such as a suspension) had been imposed on the basis of [the reprimand].").

Actually, it is of little moment that petitioner had "[t]he authority to . . . write up warnings on forms retained in the employee's personnel file." *Ten Broeck Commons*, 320 N.L.R.B. 806, 812 (1996). This is "typical in cases involving nursing-home charge nurses." *Id.* Under Board precedent, such authority is not supervisory unless it results in "personnel action . . . taken without independent investigation or review by others." *Id.* There is no evidence in this case that petitioner's authority to write up an employee was a prerequisite to discipline, or that it routinely resulted in discipline against an employee, or that it inevitably resulted in the initiation of discipline. A writeup created the "possibility" of discipline, nothing more. Under established case law, this is not enough to show supervisory status. *Compare Franklin Home Health Agency*, 337 N.L.R.B. 826, 830 (2002) ("Reporting on incidents of employee misconduct is not supervisory if the reports do not always lead to discipline, and do not contain disciplinary recommendations."), *with Progressive Transp. Servs., Inc.*, 340 N.L.R.B. 1044, 1045 (2003) ("The 33 disciplinary notices in the record signed by Yozzo establish that . . . when Yozzo decides that a potential disciplinary issue should be brought to [her supervisor's] attention, discipline ensues.").

2. *Sending Two Employees Home for Gross Misconduct After Receiving Directions from Management To Do So*

The Board also argues that **"**Jochims' authority to discipline employees is further evident from her orally reporting that two employees were unfit for work." Board's Br. at 33. The Board's description of these two incidents, without more, makes it clear that they give no evidence that petitioner acted as a supervisor:

> On one occasion, Jochims saw that an employee was slumped over, with her head resting on the counter of the nurses station. Jochims investigated the matter by asking

an LPN what was going on. The LPN informed Jochims that the employee was drunk and smelled of alcohol. Jochims called Administrator Harralson to inform him about this, and Harralson told Jochims that she should collect a urine sample from the employee and send her home. The LPN provided a urine sample to Jochims and went home.

On another occasion, Jochims noticed that CNA Sue Brisbin was eating breakfast behind the nurses station, and was failing to answer residents' call lights in violation of the Home's policies. A charge nurse approached Jochims and told her that Brisbin was taking numerous breaks and had left the facility without telling the charge nurse that she was leaving. Jochims called Assistant Director of Nursing Littrell to tell her about Brisbin's actions, and the nurses' frustration about her behavior. Littrell told Jochims "to go ahead and send [Brisbin] home."

Board's Br. at 34 (internal citations omitted). What is noteworthy about this statement of the facts is the Board's acknowledgment that petitioner neither made the decision to send the employees home nor recommended any such action. The Board attempted to discount these facts by arguing that "Jochims exercised independent judgment in initiating the process that led to the employees being sent home." *Supplemental Decision*, 345 N.L.R.B. No. 80, slip op. at 3. This surely is not enough under the case law to establish supervisory status.

In *Phelps Community Medical Center*, the Board held that a nurse was not a supervisor in a situation in which it was "clear from the director of nursing's testimony that the LPN called the director of nursing before sending the aide home." 295 N.L.R.B. at 489. The Board held that the mere call to higher management precluded a finding of supervisory status, because "[w]hether the call was to obtain permission or simply to inform

the LPN's superior, the fact remains that the director of nursing was afforded an opportunity to review the proposed action and either approve or countermand it." *Id*. at 492. Once petitioner was instructed by management to release an employee, her execution of those instructions was a routine task that did not involve independent judgment. *See VIP Health Servs.*, 164 F.3d at 649.

Moreover, "even if Jochims had herself sent employees home on rare occasions for obvious violations of the rules, it did not require independent judgment." Petitioner's Br. at 32. The case law plainly supports this point. *See, e.g.*, *Vencor Hosp. - L.A.*, 328 N.L.R.B. 1136, 1139 (1999) ("Although there was testimony that the RN team leaders have the authority to send an employee home, such authority is limited to situations involving egregious misconduct, *i.e*., behavior which endangers the health or safety of the patients. Such authority when limited to flagrant employee conduct is typically found by the Board not to constitute statutory supervisor authority."); *Northcrest Nursing Home*, 313 N.L.R.B. 491, 497 (1993) ("[M]any cases indicate that charge nurses have authority to suspend employees for flagrant violations such as drunkenness or abuse of patients. The Board has not found this an indicium of supervisory status because no independent judgment is involved; the offenses are obvious violations of the employers' policies and speak for themselves."); *Phelps*, 295 N.L.R.B. at 492 (regarding "extreme circumstances" discipline, "the Board has long held that authority that is limited to taking action in response to flagrant violation of common working conditions, such as being drunk, is insufficient by itself to establish supervisory status") (internal quotation marks omitted); *Waverly-Cedar Falls Health Care,* 297 N.L.R.B. 390, 393 (1989) ("The Board has held that authority that is limited to taking action in response to flagrant violations, such as being drunk, is insufficient by itself to establish supervisory status."); *Loffland Bros.*, 243 N.L.R.B. 74, 75 n.4 (1979) ("[T]he Board has consistently held that authority

to discharge which is limited to flagrant violation of common working conditions, such as being drunk, is insufficient by itself to establish supervisory status.").

3.  *Acknowledging Two Employees' Requests To Leave Work To Attend to Family Emergencies*

In a further attempt to support its conclusion that petitioner was a supervisor, the Board points to evidence that, on two occasions, petitioner allowed employees to leave work early to attend to personal matters. Board's Br. at 17. "The first time, a nursing assistant approached Jochims and told Jochims that her son's daycare had informed her that her son had hurt his head, and that he probably needed to be taken to an emergency room." *Id.* "On the second occasion, a CNA approached Jochims and told her that she had been informed that her young son was having an asthma attack, and that she needed to leave." *Id.* The Board argues that these incidents show that petitioner acted as a supervisor, because she "did not consult with any managerial officials" before allowing the employees to go home. *Id.* The record and applicable precedent paint a very different picture.

The Board found in its *Initial Decision* that "[t]hese isolated and exigent circumstances, involving compelling medical emergencies, show nothing more than the mere acquiescence by Jochims in the obvious need of these employees to go home." 343 N.L.R.B. No. 23, slip op. at 3. Moreover, petitioner correctly notes that she "testified that she did *not* grant any requests to leave early, but merely acknowledged that the employees were leaving early out of necessity." Petitioner's Br. at 36. Petitioner also contends that "[i]n neither of the two cases cited by the Board did Jochims grant a request to leave work early. Rather, she simply acknowledged that the situations were emergencies and that the employees had to leave." *Id.* And petitioner presses the point that she "testified repeatedly that she

did *not* have authority to allow employees to leave work early."
*Id.*

It really does not matter whether petitioner granted the employees permission to leave the facility or merely acknowledged that they were leaving to care for their sick children. Board precedent makes clear that supervisory authority does not necessarily lie where "authority to let employees leave early [] was limited to emergency situations that did not require the exercise of independent judgment, *e.g.*, if someone were sick or *had to deal with a family crisis*." *K.W. Elec. Inc. & Int'l Bhd. of Elec. Workers*, 342 N.L.R.B. 1231, 1235-36 (2004) (emphasis added). In other words, even if petitioner had the authority to allow employees to go home in an emergency, this alone would not prove supervisory status. "[P]ermitting an employee to leave early due to illness is a duty accomplished in a perfunctory manner not requiring the exercise of any discretion." *Eventide South*, 239 N.L.R.B. 287, 288 (1978) (internal quotation marks omitted); *see also Alois Box Co.*, 326 N.L.R.B. 1177, 1177-78 (1998), *enf'd*, 216 F.3d 69 (D.C. Cir. 2000); *Hydro Conduit Corp.*, 254 N.L.R.B. 433, 439 (1981); *Pinecrest Convalescent Home, Inc.*, 222 N.L.R.B. 13, 13 (1976).

4. *Completing Part of One Employee's Evaluation When Requested by Management To Do So*

Finally, the Board asserts that petitioner exercised supervisory authority when, on *one* occasion, she partially filled out a performance evaluation form on a probationary employee. This argument borders on frivolous, for it is clear that an evaluation does not indicate supervisory authority unless it effectively recommends discipline or directly affects an employee's job status. *See Lakeview Health Ctr.*, 308 N.L.R.B. 75, 78 (1992); *see also Franklin Home Health*, 337 N.L.R.B. at 831 (finding no supervisory authority where employer "ha[d] not identified or documented any specific instances in which . . .

evaluations had . . . an effect [on wages or job status].").  As with its unsuccessful attempt to show supervisory authority by virtue of written reports on employee misconduct, the Board has "failed to establish the crucial link between evaluations and an effect on employee job status."  *Crittenton Hosp.*, 328 N.L.R.B. 879, 879 (1999).

### 5. *Secondary Indicia of Supervisory Authority*

The Board additionally points to "secondary indicia" of petitioner's purported supervisory authority – such as facts that petitioner was often the senior and most highly compensated employee at the Wilshire nursing home, and that she held the title of "weekend supervisor" – to support the judgment reached in the *Supplemental Decision*.  This resort to secondary indicia of supervisory authority cannot rescue the Board's flawed reasoning.  "It is settled that secondary indicia, including the individual's job title or designation as supervisor, as well as the perception of others that the individual is a supervisor may be used in making supervisory determinations *when evidence of primary indicia is present*."  *Avante at Wilson, Inc.*, 348 N.L.R.B. No. 71, at 6, 2006 WL 3146785, \*10 (2006) (emphasis added); *see also VIP Health Servs.*, 164 F.3d at 648 (stating that an employee "must possess at least one of the twelve types of authority set out in the statute" in order to have supervisory status).

Apart from being only *secondary* evidence, and thus not creditable without primary indicia of supervisory status, the evidence cited by the Board falls on its own terms.  First, it is clear that "[i]f the persons whom the Employer contends are in charge do not possess Section 2(11) supervisory authority, then the absence of anyone else with such authority does not then automatically confer it upon [those persons]."  *Id.* at 649-50.  Furthermore, "[i]t is well settled that 'the status of a supervisor under the Act is determined by an individual's duties, not by [her] title or job classification.'"  *Dole Fresh Vegetables, Inc.*,

339 N.L.R.B. 785, 785 (2003) (quoting *T.K. Harvin & Sons*, 316 N.L.R.B. 510, 530 (1995)).

### III. CONCLUSION

The evidence cited by the Board does not support the conclusion that petitioner was a supervisor under the Act. Therefore, the Board's judgment in this case rests on nothing. Obviously, such a judgment must fail both for want of reasoned decisionmaking and a lack of substantial evidence. Accordingly, for the reasons indicated above, we reverse the Board's Supplemental Decision, grant the petition for review, and remand the case to the Board.