# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued September 12, 2008   Decided January 30, 2009

No. 07-1206

NORTHEAST BEVERAGE CORPORATION AND B. VETRANO
DISTRIBUTORS, INC.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

INTERNATIONAL BROTHERHOOD OF TEAMSTERS, LOCAL NO.
1035,
INTERVENOR

———

Consolidated with 07-1265

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

 *Thomas W. Budd* argued the cause and filed the briefs for
petitioners.

 *David A. Fleischer*, Senior Attorney, National Labor
Relations Board, argued the cause for respondent. With him

on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Meredith L. Jason*, Supervisory Attorney. *Jason Walta*, Attorney, entered an appearance.

*Gregg D. Adler* argued the cause and filed the brief for intervenor.

Before: GINSBURG, HENDERSON and GARLAND, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GINSBURG.

Opinion dissenting in part filed by *Circuit Judge* GARLAND.

GINSBURG, *Circuit Judge*: In 2002 Northeast Beverage Corporation decided to close one of its subsidiaries, B. Vetrano Distributors Inc., and consolidate its operations at another facility. Before the closing, Northeast and the union that represented the employees at Vetrano bargained over the effects of the planned consolidation. During one bargaining session, six Vetrano delivery drivers walked off the job and went to the union hall to ask their employer's bargaining representatives about their future employment. Northeast suspended the drivers and discharged five of them for leaving work. The National Labor Relations Board subsequently determined the walkout was protected by Section 7 of the National Labor Relations Act, 29 U.S.C. § 157, and the disciplinary measures were therefore unfair labor practices. The Board also found Northeast impermissibly dealt directly with one employee over a mandatory subject of collective bargaining when it revised its offers of severance to those

employees who were not discharged. *Northeast Beverage Corp.*, 349 N.L.R.B. 1166 (2007).

Northeast and Vetrano petition for review of the Board's decision that they engaged in unfair labor practices. The Board cross-appeals for enforcement of its order. We find the Board erred in holding the employees' departure from work was protected by the Act. We therefore grant the petition for review and deny enforcement of the Board's order with respect to the suspended and discharged employees. We deny the petition and grant enforcement of the Board's order as it relates to Northeast's direct dealing with an employee concerning severance pay.

## I. Background

Northeast, a Rhode Island-based distributor of beer and soft drinks, acquired two beverage distributors in Connecticut: Burt's Beverages, a nonunion facility in Bethel, and B. Vetrano Distributors, a unionized facility in Bristol. Local No. 1035, International Brotherhood of Teamsters represented the drivers and warehousemen at Vetrano. The contract between Vetrano and the Union contained a no-strike clause by which the Union "guarantee[d] the employer that there will be no authorized strikes, work stoppages, or other concerted interference with normal operations by its employees."

In the wake of the acquisitions, Northeast retained an operations consultant, Alex Reveliotty, who recommended closing Vetrano and consolidating the two operations at the Burt's facility. On May 13, 2002 Northeast met with representatives of the Union and informed them of the planned consolidation. After that meeting, the Vetrano employees learned of the consolidation and, concerned about

its implications for their jobs, several of them inquired of their employer or of the Union but received no definitive answers.

The second bargaining session between the Union and Northeast was scheduled for 10:00 a.m. on May 29 at the union hall. That morning, Gary Everett, the Union's shop steward, was scheduled to work from 3:30 to 7:30 a.m., opening the facility and loading trucks, after which he planned to attend the bargaining session. He told the other Vetrano drivers he was "going to a meeting that morning to try and get some answers for everybody to see what was going on."

Other drivers scheduled to make deliveries that day told Everett they wanted to attend the meeting, too; Everett said he did not know if it was a closed meeting, but that leaving work to attend the meeting "would not be an authorized union thing to do." Nevertheless, the drivers left work to attend the meeting in hope of getting information about how the consolidation would affect their jobs. Everett called Joseph Pignatella, a Vetrano driver who had already finished work and left the facility, to tell him the drivers were going to the meeting so he could join them. The drivers who left work at Vetrano to attend the meeting were, in order of seniority: Chris Fedor (10 years), Paul Johnson (1 year), Jerzy Marczewski (11 months), Ricardo Bosques (1 month), Robert Collins (17 days), and Russell Towle (10 days). The men left shortly before 8:00 a.m. John Vetrano, the general manager, found out about their leaving from Pignatella, who called him around 8:00 a.m.

The drivers first went to a coffee shop to formulate questions for management and to wait until the union hall opened. When they arrived at the union hall, the Union's

business manager, John Hammond, met them in the parking lot. He expressed surprise at their presence and instructed them to return to work. The Secretary/Treasurer of the Union, Chris Roos, and the Union's attorney, Gregg Adler, also told the men to return to work. The men refused, saying they wanted answers to their questions about their jobs. The union representatives said the meeting was closed and answers were not yet available. The union representatives eventually decided to allow the drivers to introduce themselves to the employer's representatives, but said the drivers could not stay after that. Northeast's representatives arrived by around 10:45. After introducing themselves to the employer's representatives, the drivers left to return to the Vetrano warehouse.

When the drivers had left the meeting, Northeast's attorney, Thomas Budd, informed the Union that the drivers' leaving work was improper and, as a result, they would be suspended indefinitely pending an investigation. Under protest from the Union, Northeast said the drivers could return to work the next day, May 30, but it would interview them to determine the appropriate discipline. Meanwhile, the six drivers who had walked off the job returned to the warehouse around 11:30 a.m., where a manager informed them they had been suspended. (Everett and Pignatella, who were not scheduled to work at the time of the meeting, were not disciplined.) The Union later filed a grievance, claiming the suspension violated the collective-bargaining agreement.

On May 31, Northeast sent the six drivers a letter explaining that it was conducting an investigation into their "illegal job action" and would "impose appropriate discipline up to and including discharge." John Vetrano was put in charge of interviewing the six drivers, and Everett was present for each interview.

At a meeting on June 14, Northeast informed the Union that the state liquor authority had approved the consolidation and the Vetrano facility would be closing the next day. It also informed the Union that five of the six drivers who had left work on May 29 would be discharged; Chris Fedor, in view of his long tenure with the Company, would receive only a one-day suspension. John Vetrano informed the other five drivers that it was their last day. Northeast sent them each a letter, dated June 18 and mailed June 19, confirming his discharge.

Also on June 19, the five discharged drivers, having seen a "help wanted" advertisement in a newspaper, went to Burt's and filled out job applications. Northeast's consultant, Reveliotty, told the hiring staff at Burt's not to interview or hire the five drivers because they had been fired for walking off the job at Vetrano. Northeast had a policy of not rehiring discharged employees.

At the June 14 meeting, Northeast had also informed the Union that Everett, Pignatella, and Fedor would be offered employment at Burt's or, if they declined employment, a severance package; Fedor would receive $15,000, Everett $11,000, and Pignatella $10,600. A few days later, Everett approached Reveliotty and told him the severance-package offers were unfair. Although Fedor had a higher salary, Everett said he and Pignatella had greater seniority and performed several "intangible" services for the Company, such as opening the warehouse in the morning and bringing in trucks at night.

According to Budd, Northeast's attorney, Reveliotty told him on June 17 that the employees were upset about the severance offers. That same day, Budd told Gregg Adler, the

Union's attorney, the Company would modify its offer and give each employee $15,000. According to Adler, however, Budd told him only that he expected Fedor to accept a job at Burt's, in which event more money would be available to increase the severance payments offered to Everett and Pignatella; as Adler understood that, no offer had yet been made.

In any event, on or about June 18 Reveliotty telephoned Everett to say he had discussed the matter with the president of Northeast and the Company would offer $15,000 to each of the three drivers. Everett then called Roos, the Secretary/Treasurer of the Union, to tell him he was not accepting a job at Burt's because of the increased severance offer. Having heard from Roos that Everett had received an offer of $15,000, Adler sent Budd a fax accusing Reveliotty of dealing directly with an employee over a mandatory subject of collective bargaining. In a letter dated June 19, Budd apologized for "any misunderstanding" and explained that as he understood their conversation of June 17, he had communicated the Company's new offer of $15,000.

On these facts, a panel of the Board unanimously held that Northeast violated §§ 8(a)(1) and (5) by bypassing the Union and dealing directly with Everett concerning his severance pay. A majority of the panel concluded that the walkout of May 29 was concerted activity for "'mutual aid' directly related to a labor dispute"; was not in breach of the no-strike clause in the collective bargaining agreement between Northeast and the Union or otherwise indefensible; and was therefore protected activity. Accordingly, the Board held Northeast violated §§ 8(a)(1) and (3) of the National Labor Relations Act by suspending the six employees, discharging five of them, and refusing to consider hiring the five discharged employees at Burt's. The Board further held

Northeast's reason for disciplining the employees were "pretextual," masking anti-union animus.

Member Schaumber, dissenting, would have held the employees did not have a "labor dispute" with the employer, wherefor their leaving work to obtain answers to their questions about job security was not protected by § 7 of the Act; Member Schaumber further concluded the Company's stated reason for the discipline was not pretextual but motivated by a legitimate business justification, *viz.*, the employees' unauthorized departure during working time.

The Board ordered Northeast to offer jobs at Burt's to the five discharged employees; make them whole for any losses suffered as a result of their suspensions and of the refusal to hire them at Burt's; expunge from their records any reference to the suspensions and discharges; and notify current and former employees of the Board's decision.

## II. Analysis

We must uphold the order of the Board unless, upon reviewing the record as a whole, we conclude the Board's findings are not supported by "substantial evidence," 29 U.S.C. § 160(f), or the Board failed to apply the proper legal standard or departed from established precedent without a reasoned justification. *Mail Contractors of America v. NLRB*, 514 F.3d 27, 31 (D.C. Cir. 2008). We conclude the Board erred in applying *NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962) to the facts of this case. We also hold the Board's decision that Northeast engaged in impermissible direct dealing is supported by substantial evidence. We therefore grant the petition for review in part and deny enforcement of the Board's order with respect to the suspended and discharged employees.

A. The Walkout

Northeast argues the walkout on May 29 was not protected: If it was a strike or other concerted interference with normal operations, then it was unprotected because it violated the no-strike clause in the collective bargaining agreement. If it was not a strike, then it was a usurpation of working time for personal purposes and unprotected by Section 7 of the Act, which protects employees' "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing, and to engage in other concerted activities for the purpose of collective bargaining or other mutual aid or protection." 29 U.S.C. § 157.

The Board concluded the May 29 work stoppage was not a strike because, when the drivers left the Vetrano facility, "they did not have a plan to pressure the employer to grant any concessions or to take any action." *Northeast Beverage Corp.*, 349 N.L.R.B. at 1167. As the Board described the walkout:

> The employees were not receiving answers to their questions regarding such issues as whether they would retain their employment, what their seniority status would be, and what their pay would be after the merger. They decided to attend the meeting to demonstrate their anxiety about these matters, and to seek answers to their questions.

The Board concluded this situation amounted to a "labor dispute" within the meaning of § 2(9) of the Act, that is, a "controversy concerning terms, tenure or conditions of

employment, or concerning the association or representation of persons in negotiating, fixing, maintaining, changing, or seeking to arrange terms or conditions of employment." 29 U.S.C. § 152(9). The "controversy," according to the Board, "was that the employees wanted definitive answers to their employment-related concerns, and their employer was not providing such answers." 349 N.L.R.B. at 1167. Thus, "their attendance at the meeting was in furtherance of their 'mutual aid' to obtain information about [their employment]" and was protected by § 7 under *Washington Aluminum*.

In that case, the Supreme Court held a spontaneous walkout, undertaken to protest bitterly cold working conditions about which the employees had previously complained, was protected by § 7. The Court explained that the walkout "did grow out of a 'labor dispute' within the plain meaning of the definition of that term in § 2(9) of the Act." 370 U.S. at 15. The record in that case showed "a running dispute between the machine shop employees and the company over the heating of the shop on cold days — a dispute which culminated in the decision of the employees to act concertedly in an effort to force the company to improve that condition of their employment." *Id*. at 15-16.

Nothing in *Washington Aluminum* suggests the Act protects an employee walkout that is not part of an ongoing "labor dispute" over "terms, tenure or conditions of employment." Here there was no such dispute; on the contrary, there was a collective bargaining agreement dealing with those subjects and ongoing bargaining over its application to an impending change of circumstances. The Board attempts to find a "labor dispute" in the facts of this case but its effort is unconvincing and does not amount to a

reasonable reading either of § 2(9) or of *Washington Aluminum*.*

In prior cases where employees absented themselves from work to engage in union activities or to seek information unrelated to an ongoing labor dispute, the Board has found

---

* Our dissenting colleague points to no facts that establish an ongoing labor dispute — that is, a controversy — between the drivers and Northeast. That the pending consolidation created "a particularly vulnerable time" for the employees, dissenting op. at 1, and that they felt an urgent "need for the information" about their future employment, dissenting op. at 2, do not make for a "labor dispute." Nor does the employees' "hop[e] to influence their employer to retain them after the merger," *id*., mean there was a labor dispute or that § 7 otherwise entitled them to walk off their old jobs in order to apply for new ones.

Neither does our dissenting colleague reconcile the facts of this case with the Supreme Court's decision in *Washington Aluminum*, which he states broadly "held that employees who left their shop because it was too cold were protected by Section 7." Dissenting op. at 3 n.1. But why were they protected by Section 7? Because, the Court said, their walkout "gr[e]w out of a 'labor dispute' within the plain meaning of the definition of that term in § 2(9) of the Act." 370 U.S. at 15. As our dissenting colleague correctly notes, we defer to the Board's reasonable interpretation of its own precedents, dissenting op. at 1, but we will not uphold an order of the Board when it has "erred in applying established law to the facts of the case," *Jochims v. NLRB*, 480 F.3d 1161, 1167 (D.C. Cir. 2007), as the Board has misapplied *Washington Aluminum* here. "We are not obligated to defer to an agency's interpretation of Supreme Court precedent under *Chevron* or any other principle. There is therefore no reason for courts — the supposed experts in analyzing judicial decisions — to defer to agency interpretations of the Court's opinions." *Univ. of Great Falls v. NLRB*, 278 F.3d 1335, 1341 (D.C. Cir. 2002) (internal citation and quotation marks omitted).

their actions unprotected. In *Gulf Coast Oil*, 97 N.L.R.B. 1513 (1952), the employees arrived at work three hours late because they had met with union representatives to learn about the benefits of union organization and had joined the union. The Board found this conduct unprotected: "The activity here amounted to an unwarranted usurpation of company time by the employees to engage in a sort of union activity customarily done during non-working time." *Id.* at 1516. In *Terri Lee, Inc*., 107 N.L.R.B. 560 (1953), the employees, upset about a cut in their piece-rate pay, left work to consult with a union about the matter. The Board found their activity unprotected and their discharge consequently lawful. In terms equally applicable, *mutatis mutandi*, to the present case, the Board said the employees did not "engage in a strike or other concerted withholding of work" but "merely intended to take the day off to obtain information from the Union, without any purpose thereby of protesting the cut in piece rates or of seeking any concession from [their employer]." *Id.* at 562. In *G.K. Trucking Corp*., 262 N.L.R.B. 570 (1982), two employees absented themselves from work to attend a union meeting where they planned to discuss their concerns with union officials and to seek representation. The Board held their actions unprotected and upheld their discharge, again in terms equally applicable to the present case:

> This is the very kind of activity which can and should take place on employees' own time. There was no urgency which called for a work-time consultation with union officials and indeed no evidence that ... the employees, either at that meeting or at any other time, organized their endeavor into a protest which involved or affected working conditions.

*Id.* at 573.

This case more closely resembles *Gulf Coast Oil*, *Terri Lee*, and *GK Trucking* than it does *Washington Aluminum*. The Board specifically found the drivers did not have a plan to pressure Northeast but wanted only to get information about their employment. The Vetrano drivers knew their shop steward, who was a member of the Union's bargaining team, would be at the meeting, was aware of their questions, and would report back to them. That the drivers were particularly anxious to get answers, and wanted to ask their questions directly, does not distinguish this case from the others in which employees left their jobs during working time to seek information that just as well could have been obtained from the union during non-working hours. Accordingly, the employees' leaving work was justified neither by connection to an ongoing labor dispute with their employer nor by a compelling necessity to attend the bargaining session that day. The employees simply used working time to engage in union-related activity customarily reserved for non-working time.

Section 7 and the relevant cases thereunder do not protect employees who leave work to seek information from their union or their employer. The Board therefore erred in treating the employees' mere quest for information as a "labor dispute." *Washington Aluminum* is inapposite because there the employees who left work were engaged in a dispute with their employer and by leaving were seeking a change in their working conditions.

Similarly, the Board's attempts to distinguish *Gulf Coast Oil* and *Terri Lee* are unconvincing. The Board distinguished *Gulf Oil* on the ground that here the drivers, as evidenced by their failure to receive answers to their questions, had no

"customary" way to obtain the relevant information. 349 N.L.R.B. at 1167-68. But the existence *vel non* of a "custom" is irrelevant where, as here, the shop steward informed the drivers that he would attend the meeting and report back to them. The Board also distinguished *Terri Lee* on the ground that here the drivers sought information directly from their employer rather than from their union. *Id.* at 1168. This is not a meaningful distinction; the drivers here, like the employees in *Terri Lee*, were told they could not leave work to attend this meeting and there was no reason questions had to be addressed to the employer's representatives then and there. If the *Terri Lee* employees had left work to address questions to the mangement of their company, the result would have been the same.

We hold the drivers' departure from work to obtain information is not protected by § 7. Because the employees' walkout was unprotected, Northeast had a legitimate business reason for disciplining them. We therefore deny enforcement to the Board's order with respect to the suspensions and subsequent discharges of the Vetrano drivers.

B. Direct Dealing

We uphold that portion of the Board's order addressed to Northeast's direct dealing with an employee concerning his severance pay. The Board found that Northeast's consultant, Alex Reveliotty, negotiated with Gary Everett — who, although the shop steward, was then acting in his personal capacity as an employee — over the severance packages he (and Pignatella) would receive. *Id.* at 1195. The Board also discredited testimony that Northeast's attorney, Thomas Budd, had communicated the new severance offer to union attorney Gregg Adler before Reveliotty had made the offer to Everett. *Id.* These factual findings provide substantial

evidence for the Board's determination that the Company dealt directly with an employee over a mandatory subject of collective bargaining.

### III. Conclusion

For the reasons set out above, we hold the employees' May 29 walkout was unprotected by the Act. Therefore, Northeast did not commit an unfair labor practice by disciplining the drivers for leaving their work. We further hold the Board's finding that Northeast dealt directly with an employee over a mandatory subject of collective bargaining is supported by substantial evidence. Accordingly, with respect to the suspensions and discharges of the employees, the petition for review is granted; the Board's cross-application for enforcement is granted with respect to the issue of direct dealing.

*So ordered.*

GARLAND, *Circuit Judge*, dissenting in part: This case presents a difficult question regarding the scope of Section 7 of the National Labor Relations Act, 29 U.S.C. § 157. "Determining whether activity is concerted and protected within the meaning of Section 7 is a task that 'implicates [the Board's] expertise in labor relations,'" and "[t]he Board's determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable." *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005) (quoting *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984)). So, too, is the Board's "interpretation of its own precedent." *Ceridian Corp. v. NLRB*, 435 F.3d 352, 355 (D.C. Cir. 2006) (internal quotation marks omitted). Of course, reasonable minds can differ about what is reasonable, and I certainly understand my colleagues' reservations. But I am unable to conclude that the Board's application of Section 7 to the facts of this case was unreasonable.

The Board's decision here was limited to the "particular exigencies of the case" by a footnote setting out the views of Chairman Battista, whose acquiescence in the Board's order was necessary to secure the two-member majority. *Northeast Beverage Corp.*, 349 N.L.R.B. No. 1166, 1168 n.12 (2007); *cf. Marks v. United States*, 430 U.S. 188, 193 (1977). Chairman Battista expressly refrained from holding "that information gathering is always a basis for a work stoppage irrespective of the nature of the information sought or the duration of the work stoppage." *Northeast Beverage*, 349 N.L.R.B. at 1168 n.12. He noted that the incident at issue in this case occurred during "a particularly vulnerable time for employees who are caught up in the transition" to a new employer that planned to close and merge their facility; that "[t]he employees here were not getting answers to critical questions regarding whether they would retain employment and, if so, what their seniority and pay would be"; and that "[t]hey absented themselves for 3 hours to seek assurances on

these vital matters." *Id.* The Board majority further noted "the obvious urgency of the drivers' need for the information" regarding whether they would continue to be employed. *Id.* at 1168. And it found as facts that the drivers were seeking "to establish that they were 'more than names on a list,'" thus "hop[ing] to influence their employer to retain them after the merger"; that Northeast's requirements regarding drivers' delivery schedules "were highly flexible"; and that their three-hour absence caused little or no disruption of the day's deliveries. *Id.* Together, these circumstances reasonably support the Board's determination "that the drivers' conduct was protected activity as it was 'mutual aid' directly related to a labor dispute — the anticipated closing of the drivers' work facility and the associated effects-bargaining." *Id.* at 1166. These circumstances also reasonably support the Board's conclusion that the instant case is distinguishable from precedents cited by Northeast. *Id.* at 1167-68.[1]

[1] *See GK Trucking Corp.*, 262 N.L.R.B. 570, 573 (1982) (ALJ Op.) (finding that a failure to report to work to attend a union meeting was unprotected where there "was no urgency which called for a worktime consultation with union officials and indeed no evidence that work-related problems were actually discussed"); *Terri Lee, Inc.*, 107 N.L.R.B. 560, 562-64 (1953) (finding that employees' absence from work was unprotected where the employer "specifically" warned the employees against it, and where it was not for the purpose of seeking anything from the employer); *Gulf Coast Oil Co.*, 97 N.L.R.B. 1513, 1516 (1952) (finding that employees' late arrival at work was unprotected where it "violated [the employer's] known established [work] rule," was for the purpose of engaging in union activity that was "customarily done during nonworking time," and took place during work merely for the employees' "own convenience").

For its part, Northeast argues that the instant case is distinguishable from a Supreme Court precedent cited by the Board, *NLRB v. Washington Aluminum Co.*, 370 U.S. 9 (1962).

3

I also conclude that there is substantial evidence to support the Board's "separate finding" that Northeast "acted pursuant to a plan to avoid employing a significant number of union-represented employees at the merged Burt's facility," and that "[t]he reasons advanced by [Northeast] for suspending and discharging the drivers and for subsequently refusing to consider and refusing to hire them for employment at Burt's were pretextual, and were asserted to conceal an antiunion motive." *Id.* at 1166-67 n.6; *see id.* at 1193 (ALJ Op.) (concluding that Northeast failed to meet its burden under *Wright Line*, 251 N.L.R.B. 1083 (1980), to demonstrate that it would have taken the same actions "in the absence of [the employees'] membership in and support for the Union"). The testimony of Northeast's operations consultant established that, "even before May 29, 2002, [Northeast] did not want to hire any of the Vetrano drivers and did not want to recognize the Union at the merged facility" in Bethel. *Id.* at 1167 n.6 (Board Op.); *see id.* at 1191-93 (ALJ Op.). Substantial evidence showed "that under the policies in place at B. Vetrano on May 29, [Northeast] would not have disciplined the employees for their activities" on that day. *Id.*

---

Unlike its own precedents, we do not defer to the Board's interpretation of precedents of the Supreme Court. And it is certainly true that the instant case can be distinguished from *Washington Aluminum*, which held that employees who left their shop because it was too cold were protected by Section 7. But nothing in *Washington Aluminum* forecloses the Board from finding that the conduct in this case was also protected, particularly given the Court's declaration that employees do not "lose their right to engage in concerted activities under § 7 merely because they do not present a specific demand upon their employer to remedy a condition they find objectionable." *Id.* at 14. The only issue before this court is the *Board's* determination that the drivers' conduct was protected, and that is a determination to which we must defer if it is reasonable.

4

at 1193; *see id.* at 1168 (Board Op.) (noting that "no driver had ever before been disciplined for making late deliveries"). It further showed that, although Northeast repeatedly "told the Union that jobs were not available [in Bethel,] at the same time ... it was advertising for drivers in the local newspapers." *Id.* at 1192 (ALJ Op.). "When confronted with this contradiction, [Northeast's president] said the ads were for warehouse people, a blatant untruth." *Id.* Similarly, the reason Northeast gave at the hearing for not hiring the former Vetrano drivers — that they lived too far from Bethel — was contradicted by the fact that Northeast hired other employees with similar commutes. *Id.* at 1192-93. This and other evidence is sufficient to support the conclusion that Northeast's "policy was to avoid hiring Union-represented employees" and that the reasons it offered for suspending, discharging, and refusing to hire them at Bethel were pretextual. *Id.* at 1193.

For the foregoing reasons, I would deny Northeast's petition and enforce the Board's order in full.[2]

---

[2] I would deny Northeast's petition with respect to the direct dealing issue for the reasons stated in the court's opinion, *supra*.