# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

Argued September 13, 2011      Decided December 9, 2011

No. 10-1272

FORTUNA ENTERPRISES, LP,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITE HERE LOCAL 11,
INTERVENOR

Consolidated with 10-1298

On Petitions for Review and Cross-Application for
Enforcement of an Order of the National Labor Relations
Board

*Stephen R. Lueke* argued the cause and filed the briefs for
petitioner.

*Kira Dellinger Vol*, Attorney, National Labor Relations
Board, argued the cause for respondent. With her on the brief
were *John H. Ferguson*, Associate General Counsel, *Linda
Dreeben*, Deputy Associate General Counsel, and *Jill A. Griffin*,
Supervisory Attorney.

*Eric B. Myers* was on the brief for intervenor Unite Here Local 11. *Richard G. McCracken* entered an appearance.

Before: GINSBURG[1] and HENDERSON, *Circuit Judges*, and RANDOLPH, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* RANDOLPH.

RANDOLPH, *Senior Circuit Judge*: This is a petition for review of a National Labor Relations Board order finding Fortuna Enterprises, L.P., in violation of § 8(a)(1) and (3) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1) & (3). The Board cross-petitions for enforcement. Unite Here, Local 11, a labor union, has intervened. Fortuna operates the Los Angeles Airport Hilton Hotel and Towers. The case turns on whether Hilton disciplined its employees for engaging in activities protected by § 7 of the Act, *id.* § 157.

On May 10, 2006, Hilton suspended Sergio Reyes pending an investigation into whether he had stolen property from a hotel guest. Reyes supported an ongoing union organizing campaign at the Hilton led by Unite Here. When other employees learned of Reyes' suspension, they decided to meet the next morning in the staff-only cafeteria to speak about the matter with Hilton's general manager Grant Coonley or Tom Cook, the food and beverage director.

On the morning of May 11 at 8:00 a.m., seventy to one hundred employees gathered in the cafeteria. Hilton supervisors learned of the gathering and its purpose a short time later.

---

[1] As of the date the opinion was published, Judge Ginsburg had taken senior status.

Housekeeping director Anna Samayoa addressed the employees on three separate occasions between 8:15 and 9:00 a.m. The first time, she announced that they needed to return to work if they were not on break; the second time, that they needed to return to work or clock out and go home; and the third time, that individuals who failed to choose one of those options would be suspended. A handful of employees returned to work. The rest insisted on staying put until they met with Coonley or Cook. Supervisors suspended the holdouts at 9:00 a.m. and informed them that anyone who did not promptly leave the premises would be considered a trespasser. Undeterred, the suspended employees remained in the cafeteria and repeated their demand for a meeting.

The standoff persisted for roughly ninety more minutes, during which time the employees became increasingly frustrated with the lack of a management response. A delegation of employees told company officials that the group wanted to return to work. Management declined the offer, citing the suspensions. Out of options and faced with the arrival of a police officer, the employees left the cafeteria at approximately 10:30 a.m. All told, seventy-seven protesters were suspended for five days each, due to their "[i]nsubordination" and "[f]ailure to follow instructions."

The suspensions left Hilton shorthanded for the remainder of the day. Management called in temporary workers; even so, some of Hilton's operations were adversely affected. For instance, Cook had to recruit staff from Hilton's accounting and sales offices to bus tables in the guest café, which converted to buffet-style service due to the staff shortage. In addition, the housekeeping division was unable to clean all of the hotel's guest rooms, which were 99.9% occupied at the time.

Three weeks later, on June 3, a second incident resulted in more disciplinary actions. On that date, a union – the California Teachers Association – held a meeting in the hotel's international ballroom. The Association invited two of Hilton's employees, Isabel Brentner and Patricia Simmons, to speak to its members about the May 11 work stoppage. Brentner and Simmons did so during their lunch breaks. When management learned of this, it issued each of them a written warning for violating Hilton's facilities use policy, which prohibits on-duty employees from entering the hotel's public areas without authorization. Three other Hilton employees, Lilia Magallon, Juana Salinas, and Joanna Gomez, received similar warnings after management determined that they had also attended the meeting. Although these employees denied entering the ballroom, video footage taken by a nearby security camera showed each of them disappearing from view near its entrance for brief periods as they cleaned an adjacent lobby area.

The Board's general counsel issued a complaint based on the May 11 suspensions, the June 3 warnings, and several other incidents. An Administrative Law Judge found the May 11 suspensions unlawful under § 8(a)(1) because the employees were engaged in concerted action for the "mutual aid or protection" of Reyes, their co-worker, and were thus protected by § 7 of the Act. *See* 29 U.S.C. § 157. After considering the factors mentioned in *Quietflex Manufacturing Co.*, 344 N.L.R.B. 1055 (2005), the ALJ concluded that the employees' organizational interests outweighed Hilton's property rights. The ALJ also found that the June 3 warnings violated § 8(a)(1) and (3), for two reasons. First, the warnings resulted from Hilton's disparate application of its facilities use policy to employees who Hilton knew had engaged in union activity. Second, Hilton's investigation was inadequate, and thus pretextual, inasmuch as Hilton made no attempt to interview the employees before disciplining them.

The Board affirmed the ALJ's rulings, findings, and conclusions, subject to several minor modifications. *Fortuna Enters., L.P.*, 355 N.L.R.B. No. 122, 2010 NLRB LEXIS 280 (Aug. 24, 2010).[2] With respect to the May 11 gathering, the Board explained that "the length of the work stoppage in the cafeteria and the potential for interference with the provision of [hotel] services" made the § 8(a)(1) question a "close" one. 2009 NLRB LEXIS 136, at *4 n.8. But "the unrepresented employees did not lose the protection of the Act, particularly when [Hilton's] officials failed to make it clear that the employees would not be able to meet with senior management at that time and would have alternative opportunities to present their concerns." *Id.* at *4 & n.8; *see also* 2010 NLRB LEXIS 280, at *3 n.3 (converting Member Schaumber's position in the 2009 decision into the Board's holding). As to Hilton's policy regarding employees in public areas, the Board found that Hilton "disparately applied" the policy "to the employees and used th[e] policy as a pretext to discipline known union supporters who did not even violate the rule." 2009 NLRB LEXIS 136, at *3 & n.5; *see also* 2010 NLRB LEXIS 280, at *3 n.3. This conclusion obviated the need to pass on the ALJ's alternative ruling that the warnings violated § 8(a)(1) and (3) because Hilton's investigation was inadequate. 2009 NLRB LEXIS 136, at *3 n.5.

---

[2] This decision reinstated and incorporated by reference two earlier Board decisions, both of which were issued by a two-member Board. *See* 354 N.L.R.B. No. 95, 2009 NLRB LEXIS 335 (Oct. 29, 2009); 354 N.L.R.B. No. 17, 2009 NLRB LEXIS 136 (Apr. 30, 2009). The Supreme Court's decision in *New Process Steel, L.P. v. NLRB*, 130 S. Ct. 2635 (2010), invalidated those decisions. *See id.* at 2644-45. Because a three-member panel issued the Board's decision under review, the decision complies with *New Process Steel*. *See id.*

I

Section 7 of the Act grants employees "the right to self-organization . . . and to engage in other concerted activities for the purpose of . . . mutual aid or protection . . .." 29 U.S.C. § 157. Section 8(a)(1) prohibits employers from "interfer[ing] with, restrain[ing], or coerc[ing] employees in the exercise of" those rights. 29 U.S.C. § 158(a)(1).

On-the-job work stoppages may qualify as concerted economic pressure entitled to protection under § 7. *Quietflex*, 344 N.L.R.B. at 1056; *see also Molon Motor & Coil Corp. v. NLRB*, 965 F.2d 523, 525 (7th Cir. 1992) (citing *NLRB v. Wash. Aluminum Co.*, 370 U.S. 9, 15 (1962)). But the protection is not absolute because on-site work stoppages trench upon employers' private property rights. *See Quietflex*, 344 N.L.R.B. at 1056 (citing *Hudgens v. NLRB*, 424 U.S. 507, 522 (1976)). The Board's task is to accommodate these competing interests, preserving each "with as little destruction of one as is consistent with the maintenance of the other." *Hudgens*, 424 U.S. at 521 (quoting *NLRB v. Babcock & Wilcox Co.*, 351 U.S. 105, 112 (1956)). The proper resolution in a given case "depend[s] on the nature and strength of the respective § 7 rights and private property rights" involved. *Id.* at 522.

In *Quietflex* the Board offered a list of factors it had "considered" in previous cases "in determining which party's rights should prevail in the context of an on-site work stoppage . . .." 344 N.L.R.B. at 1056-57. [3] The Board did not quantify

---

[3] The *Quietflex* factors are: (1) the reason the employees have stopped working; (2) whether the work stoppage was peaceful; (3) whether the work stoppage interfered with production, or deprived the employer access to its property; (4) whether employees had adequate opportunity to present grievances to management; (5) whether

the particular weight of any factor and several of them appear to overlap. *See id.* at 1056; *cf. PDK Labs. Inc. v. DEA*, 362 F.3d 786, 797 (D.C. Cir. 2004). For instance, determining "whether the work stoppage was peaceful" may often involve the same considerations as "whether the employees attempted to seize the employer's property." *See Quietflex*, 344 N.L.R.B. at 1056-57. And the seizure question may amount to the same thing as whether the employees "deprived the employer of access to its property." *Id.* Although the sort of multi-factor balancing "test" suggested in *Quietflex* may be incapable of predictable application, *see Exacto Spring Corp. v. Comm'r*, 196 F.3d 833, 834-38 (7th Cir. 1999), we shall assume its validity.

Hilton asks us to set aside the order with respect to the May 11 suspensions on the ground that the Board's assessment of nine of the ten *Quietflex* factors was flawed. This court must of course uphold the Board's ruling so long as its legal determinations are not arbitrary or capricious and its factual findings are supported by substantial evidence. *E.I. du Pont de Nemours & Co. v. NLRB*, 489 F.3d 1310, 1314 (D.C. Cir. 2007).

As to the first *Quietflex* factor – why the employees stopped working – the Board determined that the employees occupied the cafeteria to express support for co-worker Sergio Reyes, and to ensure that Hilton would not unfairly target other union supporters for discipline. Hilton claims that the occupation was unprotected because it was intended only to seek information,

---

employees were given any warning that they must leave the premises or face discharge; (6) the duration of the work stoppage; (7) whether employees were represented or had an established grievance procedure; (8) whether employees remained on the premises beyond their shift; (9) whether the employees attempted to seize the employer's property; and (10) the reason for which the employees were ultimately discharged. 344 N.L.R.B. at 1056-57.

and thus did not grow out of a bona fide labor dispute. *See Ne. Beverage Corp. v. NLRB*, 554 F.3d 133, 140 (D.C. Cir. 2009) ("Section 7 and the relevant cases thereunder do not protect employees who leave work to seek information from their union or their employer."). This contention fails to appreciate the nature of the employees' grievance. Unlike the employees in *Northeast Beverage*, the Hilton employees did not leave work to duplicate a request for information their union had already made regarding the employer's future plans. *See id.* at 135-36. Instead, they gathered to express their shared concern about discrimination against union supporters.[4] The subject of their concern falls within the Act's definition of a "labor dispute," which includes "any controversy concerning terms, tenure or conditions of employment," 29 U.S.C. § 152(9), or at least the Board was entitled to so find. *See, e.g.*, *NLRB v. Pepsi-Cola Bottling Co. of Miami, Inc.*, 449 F.2d 824, 830 n.5 (5th Cir. 1971); *see also* 29 U.S.C. § 157 (guaranteeing employees the right "to engage in . . . concerted activities for the purpose of . . . mutual aid or protection").

With two exceptions, there is nothing to the balance of Hilton's arguments against the Board's application of the *Quietflex* factors. The exceptions are the Board's treatment of factor (3) – "whether the work stoppage interfered with production," and factors (4) and (7) – "whether employees had adequate opportunity to present grievances to management" or access to "an established grievance procedure." *Quietflex*, 344 N.L.R.B. at 1057.

---

[4] The *Northeast Beverage* employees were represented by a union actively bargaining on their behalf. *See* 554 F.3d at 135. Here, by contrast, the employees were not represented by a union or engaged in ongoing talks with Hilton. This distinction is meaningful insofar as unrepresented employees are entitled to some leeway to "speak for themselves as best they [can]." *Wash. Aluminum*, 370 U.S. at 14.

In mentioning interference with production, *Quietflex* dropped a footnote stating: "It is not considered an interference of production where the employees do no more than withhold their own services." *Id.* at 1057 n.6. We are not quite sure what to make of this. Suppose all fifty employees on an assembly line walked off the job. Or suppose only half of them walked off but this was enough to require shutting down the line. According to the Board's footnote, in neither instance would there have been an interference with production – a conclusion at odds with reality. Furthermore, the point of this *Quietflex* factor is unclear. Some protected activities exert economic pressure on the employer *by interfering with production*. A strike is the prime example. *See Div. 1287, Amalgamated Ass'n of Street, Elec. Ry. & Motor Coach Emps. of Am. v. Missouri*, 374 U.S. 74, 80-82 (1963); *NLRB v. Erie Resistor Corp.*, 373 U.S. 221, 234 (1963). An on-site work stoppage is a form of strike. *See* 29 U.S.C. §§ 142(2) (defining a strike as "any strike or other concerted stoppage of work by employees"), 163 (protecting "the right to strike"). We do not know whether the Board in *Quietflex* meant to suggest that if the stoppage exerted economic pressure – that is, if it interfered with production or the provision of services – this would render the activity less protected. We do know that a majority of the Board in this case at least acknowledged that the work stoppage had "the potential for interference with the provision of services," 2010 NLRB LEXIS 280, at *3 n.3; 2009 NLRB LEXIS 136, at *4 n.8, even though the participating employees did "no more than withhold their own services," *Quietflex*, 344 N.L.R.B. at 1057 n.6. The record also shows that the work stoppage did disrupt some of Hilton's operations.

In any event, it does not appear that the interference-with-production factor played a significant role in the Board's ruling against Hilton. The apparently decisive consideration related to Hilton's handling of employee grievances. *See* 2009 NLRB

LEXIS 136, at *4 n.8. In this regard, the Board stated that management never told the employees gathered in the cafeteria that the two senior officials they wanted to talk with were not available, or that the employees would have other opportunities to present their concerns. *Id.* In so holding the Board adopted the ALJ's determination that the complaint procedure Hilton had in place "addressed only individual complaints and not group grievances like the one presented in the instant case." 2009 NLRB LEXIS 136, at *1-2, 50.

The record does support the finding that Hilton officials suspended the employees without notifying them that a meeting with senior managers was not immediately possible or offering a future opportunity to meet. But those omissions are much less significant if Hilton employees had access to an established procedure for handling "group grievances." The Board found that they did not. Hilton responds that it *did* have such a procedure in place, that it was widely known and often used, and that management therefore had no obligation to inform the employees in the cafeteria that it would hear and consider their concerns in the future. We agree.

Grievance procedures provide an orderly means for resolving employee concerns and thus promote the Act's goal of achieving "industrial peace and stability." *Auciello Iron Works, Inc. v. NLRB*, 517 U.S. 781, 785 (1996). For this reason, the availability of a grievance procedure cuts against the justification for protecting on-the-job work stoppages. *See, e.g.*, *Cone Mills Corp. v. NLRB*, 413 F.2d 445, 451-52 (4th Cir. 1969); *Cambro Mfg. Co.*, 312 N.L.R.B. 634, 636 (1993). Hilton had an "open door" policy to handle employee complaints. The Board acknowledged the policy, but then erred in finding it inadequate on the ground that the policy did not deal with group grievances. That finding is at odds with the text of the policy,

which is in no way limited to individual complaints.[5] And it is contrary to Hilton's longstanding implementation of the "open door" policy. The record demonstrates that Hilton managers addressed group grievances relating to hotel equipment, employee uniforms, working conditions, and other matters on numerous occasions. To the extent the Board's decision rests on its comparison of Hilton's "open door" policy to the one at issue in *HMY Roomstore, Inc.*, 344 N.L.R.B. 963 (2005), the analogy fails. The *Roomstore* policy, unlike Hilton's, was "used to resolve individual problems and not group complaints." *Id.* at 963 n.2. The Board's grievance procedure finding therefore is not supported by substantial evidence.

As we have said, the Board never quantified the weight to be given to any one of the *Quietflex* factors. In this case, we know only that the Board emphasized the absence of a group grievance procedure in its decision and that its finding to this effect was in error. We therefore grant the petition for review

---

[5] The policy states:

Hilton Los Angeles Airport is proudly committed to maintaining an open door policy. Any discrimination or recrimination against a team member for presenting an issue, problem or complaint is prohibited.

A team member should always attempt to work out problems with his/her immediate supervisor. If the issue or problem remains unresolved, the team member can seek assistance from his/her department manager, the Director of Human Resources and the General Manager.

with respect to the Board's assessment of the May 11 protest and remand this issue for reconsideration by the Board.[6]

## II

Section 8(a)(3) of the Act makes it an unfair labor practice for an employer to "discourage membership in any labor organization" by "discriminat[ing] in regard to . . . any term or condition of employment." 29 U.S.C. § 158(a)(3). To prove a § 8(a)(3) violation, the Board must first demonstrate that anti-union animus motivated the employer to take an adverse employment action. *See Tasty Baking Co. v. NLRB*, 254 F.3d 114, 125-26 (D.C. Cir. 2001). The employer's motive may be inferred from knowledge of an employee's union activities, expressions of hostility towards the union, the timing of the adverse action, or other circumstantial evidence of like kind. *Id.; see also Waterbury Hotel Mgmt., LLC v. NLRB*, 314 F.3d 645, 651 (D.C. Cir. 2003). "If the Board succeeds" in making out a prima facie case, "the employer still can successfully mount an affirmative defense by showing that it would have taken the same action in the absence of anti-union considerations." *Sierra Realty Corp. v. NLRB*, 82 F.3d 494, 495 (D.C. Cir. 1996); *see NLRB v. Transp. Mgmt. Corp.*, 462 U.S. 393, 399-404 (1983) (approving the burden-shifting test adopted in *Wright Line*, 251 N.L.R.B. 1083 (1980)).

---

[6] This outcome also requires us to set aside and remand the Board's separate ruling that Rogelio de la Rosa violated § 8(a)(1) when he threatened to suspend Fidel Andrade for participating in the May 11 work stoppage. 2009 NLRB LEXIS 136, at *4, 29-30. The Board held that de la Rosa's threat was unlawful because the work stoppage was protected by § 7. If it was not protected, the threat was lawful.

There is no question that the warnings issued to Brentner, Simmons, Magallon, Salinas, and Gomez adversely affected the terms or conditions of their employment.  It is also clear that, as Hilton stipulated, management knew each of the employees had engaged in union activities.  Hilton claims, however, that there is no evidence that it knew the employees had engaged in protected activity on June 3 and that there is no evidence to show that their participation in the May 11 protest motivated the company to issue the warnings.  *See* 2009 NLRB LEXIS 136, at \*61-62 (ALJ's findings to same effect).  Hilton's points are accurate, but inconsequential.  In most circumstances, § 8(a)(3) liability cannot arise unless the employer knows of an employee's union activities.  *Davis Supermarkets, Inc. v. NLRB*, 2 F.3d 1162, 1168 (D.C. Cir. 1993).  But there is no requirement that those activities occur on the same day the adverse employment action is taken.  Hilton's stipulation that it knew *generally* of the employees' union activities fully satisfied this standard.  Therefore, the Board met its burden under § 8(a)(3) so long as substantial evidence supports its finding that anti-union animus played a role in Hilton's decision to issue the warnings.

The record provides ample support for the Board's finding. Sue Trobaugh, Hilton's human resources director, testified that she knew about, but chose not to investigate, other violations of the facilities use policy.  According to Trobaugh, maintenance staff complained that other employees were using public restrooms near the hotel lobby.  This created extra cleanup work and contravened the facilities use policy, which required on-duty employees to use restrooms located in the hotel's non-public areas.  Although Trobaugh was aware of these violations, she decided that they were not "an investigative matter" and thus made no effort to pursue them.  Hilton's selective enforcement of the policy against Brentner, Simmons, Magallon, Salinas, and Gomez, but not against other, equally culpable employees, not only justifies the Board's inference of anti-union animus, but

also forecloses any argument that Hilton "would have taken the same action in the absence of the unlawful motive." *Tasty Baking Co.*, 254 F.3d at 126-28; *see also Waterbury*, 314 F.3d at 653; *U-Haul Co. of Cal.*, 347 N.L.R.B. 375, 388-89 (2006), *enforced*, 255 F. App'x. 527 (D.C. Cir. 2007).

For these reasons, we enforce the portion of the Board's order finding that Hilton violated § 8(a)(1) and (3)[7] by issuing warnings to Brentner, Simmons, Magallon, Salinas, and Gomez.

## III

In addition to its rulings on the May 11 suspensions and the June 3 warnings, the Board also held that Hilton committed a number of other § 8(a)(1) violations. *See* 2009 NLRB LEXIS 335, at \*1-3; 2009 NLRB LEXIS 136, at \*1-5. Hilton maintains that the Board erred in doing so, but confines its argument to a short footnote. As a result, we will not consider Hilton's objections. *See Comm'r v. Simmons*, 646 F.3d 6, 12 (D.C. Cir. 2011). The Board is entitled to summary enforcement of these additional, effectively uncontested rulings. *Flying Food Grp., Inc. v. NLRB*, 471 F.3d 178, 181 (D.C. Cir. 2006).[8]

---

[7] Conduct that violates any of the more specific prohibitions of § 8, including § 8(a)(3), also interferes with employees' § 7 rights and thus violates § 8(a)(1) derivatively. *See Metro. Edison Co. v. NLRB*, 460 U.S. 693, 698 n.4 (1983); ROBERT A. GORMAN & MATTHEW W. FINKIN, BASIC TEXT ON LABOR LAW: UNIONIZATION AND COLLECTIVE BARGAINING 150 (2d ed. 2004).

[8] For the sake of clarity, these findings are that Hilton managers unlawfully (1) interrogated employee Ricardo Molina; (2) threatened employees Antonio Campos and Beatrice Reyes; (3) barred various employees from wearing union insignia; (4) warned employee Nathalie Contreras for protesting customer harassment of other employees; and (5) pushed Campos away from co-workers who were

The same is true of the Board's rulings regarding threats made by managers Chriss Draper and Anna Samayoa towards union-affiliated employees. Hilton contends that the Board erred by "declining to rule" on these incidents, despite the ALJ's conclusion that each gave rise to a § 8(a)(1) violation. Although some cases have suggested that § 10(c) of the Act requires the Board to resolve every charge that is presented to it, *see Oil, Chem. & Atomic Workers Local Union No. 6-418 v. NLRB*, 711 F.2d 348, 362 (D.C. Cir. 1983); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers v. NLRB*, 427 F.2d 1330, 1331-32 (6th Cir. 1970), any omission on the Board's part was harmless in this instance, *see Tasty Baking Co.*, 254 F.3d at 123. The Board determined that resolving the threat claims "would be cumulative and would not materially affect the remedy." 2009 NLRB LEXIS 136, at *4 n.6. That conclusion is entitled to substantial deference, *see Petrochem Insulation, Inc. v. NLRB*, 240 F.3d 26, 34 (D.C. Cir. 2001), and is reasonable given the already sweeping nature of the remedial orders, *see* 2009 NLRB LEXIS 335, at *3-4, 10-12; 2009 NLRB LEXIS 136, at *7-8, 83-87.

*   *   *

For the foregoing reasons, the petition for review is granted in part and denied in part. The cross-petition for enforcement is likewise granted in part and denied in part. The case is remanded to the Board for further proceedings consistent with this opinion.

*So ordered.*

---

engaged in protected activity.