# United States Court of Appeals

**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

―――――

Argued March 17, 2015          Decided June 12, 2015

No. 14-1099

FORTUNA ENTERPRISES, LP,
PETITIONER

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

UNITE HERE LOCAL 11,
INTERVENOR

―――――

Consolidated with 14-1115

―――――

On Petition for Review and Cross-Application
for Enforcement of an Order of
the National Labor Relations Board

―――――

*Stephen R. Lueke* argued the cause for petitioner. With him on the briefs was *Stefan H. Black*.

*Edward D. Swidriski III*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Richard F. Griffin*, *Jr.*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Deputy Associate General Counsel, and *Kira Dellinger Vol*, Supervisory Attorney.

*Eric B. Myers* was on the brief for intervenor Unite Here, Local 11, in support of respondent.

Before: GRIFFITH and KAVANAUGH, *Circuit Judges*, and SENTELLE, *Senior Circuit Judge*.

Opinion for the Court filed by *Senior Circuit Judge* SENTELLE.

SENTELLE, *Senior Circuit Judge*: Fortuna Enterprises, L.P., petitions for review of a National Labor Relations Board order finding that Fortuna violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), by suspending seventy-seven employees for participating in an on-site work stoppage. *See Fortuna Enters., L.P.*, 360 NLRB No. 128 (May 30, 2014), 2014 WL 2448880. The Board filed a cross-application for enforcement of the challenged order; and labor union Unite Here, Local 11, intervenes in favor of enforcement. For the reasons stated below, we will deny Fortuna's petition to review the Board's order and grant the Board's cross-application for enforcement.

## I.   BACKGROUND

### A.   *Factual Background*

Petitioner Fortuna Enterprises operates the Los Angeles Airport Hilton Hotel and Towers (hereinafter "Hilton").

Beginning in January 2006, intervenor union, Unite Here, Local 11, conducted a public campaign to organize Fortuna's employees at the Hilton. On May 10, 2006, Fortuna suspended employee Sergio Reyes pending an investigation of allegations of theft. Suspecting that Reyes's suspension was related to his union activities, several employees decided to meet the following morning in the staff cafeteria to induce management (specifically, Hilton's general manager Grant Coonley or Hilton's food and beverage director Tom Cook) to address the employees' concerns over Reyes's suspension.

At 8:00 a.m. on May 11, 2006, seventy to one hundred employees gathered in the cafeteria. Upon arriving at the cafeteria, the employees asked a security guard to inform Coonley and Cook that the employees wanted to meet with them. When housekeeping director Anna Samayoa arrived at the cafeteria at approximately 8:13 a.m., the security guard notified Samayoa that the employees had requested a meeting with Cook or Coonley. The guard told Samayoa that Cook was on his way, but Coonley was not at the hotel. Samayoa attempted to reach Cook by telephone, but received no answer.

At approximately 8:26 a.m., Samayoa ordered the employees gathered in the cafeteria to return to work if they were not on break. Employee Michael Vargas responded that the employees were not leaving until they spoke to Coonley or Cook. Samayoa told Vargas that Coonley was not available, and Vargas responded, "Then we need to speak to [Cook]." *Fortuna*, 2014 WL 2448880, at *2. At 8:32 a.m., Samayoa again ordered the employees to return to work if they were not on break. The employees did not comply. At 8:57 a.m., Samayoa reiterated her order, this time adding that employees would be suspended if they remained in the

cafeteria. Vargas then asked Samayoa to try to reach Coonley on his cell phone; Samayoa responded that she would try.

A few minutes after the third warning, Samayoa began suspending employees one by one. Vargas intervened and asked Samayoa to "focus on contacting Mr. Coonley." Samayoa responded, "Yes, I will try," and left the cafeteria. *Id.* About this time, Hilton's chief of security Grant Taylor announced that he was going to call the police if the employees failed to leave. Despite this threat, however, Taylor also promised Vargas that he would try to contact Coonley. A half an hour later, at approximately 9:30 a.m., Vargas asked Samayoa if she had contacted Coonley. Samayoa responded, "No, we're still waiting just like you are." *Id.* Vargas also asked hotel chief steward Rogelio de la Rosa to contact Coonley, Cook, or human resources manager Sue Trobaugh. De la Rosa responded, "Okay, let me go and see what I can do." *Id.*

At approximately 10:15 a.m., having received no response from Coonley or Cook, a delegation of eight to ten employees informed management that they wanted to return to work. Kitchen supervisor David Aragon, after speaking with Cook, informed the employees that they were suspended and could not return to work. Shortly thereafter, Samayoa, accompanied by a police officer, confirmed to the delegation that the employees who participated in the work stoppage were suspended and could not return to work. Having been informed of their suspensions by the returning employee delegation, the remaining employees left the cafeteria at approximately 10:30 a.m. Ultimately, seventy-seven employees who participated in the work stoppage were suspended for five days for "[i]nsubordination" and "[f]ailure to follow instructions." *Id.* at *3.

### B.  Procedural Background

The National Labor Relations Board's general counsel issued a complaint against Fortuna based on the May 11 suspensions and other alleged anti-union conduct.   An Administrative Law Judge found the suspensions violated § 8(a)(1) of the National Labor Relations Act, 29 U.S.C. § 158(a)(1), because the employees participating in the work stoppage were engaged in concerted action for "mutual aid or protection" under § 7 of the Act, 29 U.S.C. § 157.  *Fortuna Enters., L.P.*, 354 NLRB 202, 211 (2009) (Board adopting and appending ALJ's decision).  In determining whether the concerted activity was protected under § 7, the ALJ undertook to apply the Board precedent set forth in *Quietflex Manufacturing Co.*, 344 NLRB 1055 (2005).  *See id.*

In *Quietflex*, the Board identified ten factors "that the Board ha[d] considered in determining" whether the organizational rights of employees engaged in a work stoppage outweighed the property rights of the employer.  344 NLRB at 1056.  The factors listed by the Board in *Quietflex* are:

(1) the reason the employees have stopped working;

(2) whether the work stoppage was peaceful;

(3) whether the work stoppage interfered with production, or deprived the employer access to its property;

(4) whether employees had adequate opportunity to present grievances to management;

(5) whether employees were given any warning that they must leave the premises or face discharge;

(6) the duration of the work stoppage;

(7) whether employees were represented or had an established grievance procedure;

(8) whether employees remained on the premises beyond their shift;

(9) whether the employees attempted to seize the employer's property; and

(10) the reason for which the employees were ultimately discharged.

*Id.* at 1056–57; *see also Fortuna Enters., L.P. v. NLRB*, 665 F.3d 1295, 1300 n.3 (D.C. Cir. 2011).

The ALJ in the *Fortuna* dispute expressly considered each of the ten *Quietflex* factors and concluded that each factor either weighed in favor, or did not weigh against, protection of the work stoppage. 354 NLRB at 211–12. Thus, the ALJ determined that Fortuna violated § 8(a)(1) of the National Labor Relations Act by suspending the employees. The National Labor Relations Board ultimately affirmed and adopted the ALJ's findings of fact and conclusions of law, subject to minor modifications. *Id*. at 203 & n.3; *see also Fortuna Enters., L.P.*, 355 NLRB 602 (2010) (reinstating and incorporating by reference Board's earlier decisions which were issued by a two-member Board in contravention of *New Process Steel, L.P. v. NLRB*, 560 U.S. 674 (2010)).

Fortuna petitioned this Court for review. *Fortuna*, 665 F.3d at 1298. Fortuna asked the Court to set aside the Board's order with respect to the May 11 suspensions on the ground that the Board's assessment of nine of the ten *Quietflex* factors was flawed. *Id*. at 1300. After rejecting Fortuna's objection to the Board's assessment of the first *Quietflex* factor (why the employees stopped working), we held that "[w]ith two exceptions, there is nothing to the balance of [Fortuna's] arguments against the Board's application of the *Quietflex* factors." *Id*. at 1301. "The exceptions are the Board's treatment of factor (3)—'whether the work stoppage interfered with production,' and factors (4) and (7)—'whether employees had adequate opportunity to present grievances to management' or access to 'an established grievance procedure.'" *Id*. (quoting *Quietflex*, 344 NLRB at 1057).

With respect to the third factor, interference with production, *Quietflex* stated in a footnote, "It is not considered an interference of production where the employees do no more than withhold their own services." 344 NLRB at 1057 n.6. We were "not quite sure what to make of this" footnote. *Fortuna*, 665 F.3d at 1301. Indeed, "the point of this *Quietflex* factor is unclear" given that "[s]ome protected activities," such as strikes, "exert economic pressure on the employer *by interfering with production*." *Id*. (emphasis in original). We thus remanded to the Board for an explanation of the third *Quietflex* factor and an assessment of how this factor relates to the May 11 work stoppage. *Id.* at 1303.

We then turned to the Board's consideration of the fourth and seventh *Quietflex* factors (whether employees had adequate opportunity to present grievances to management or access to an established grievance procedure). Considering these factors, "the Board adopted the ALJ's determination that the complaint procedure [Fortuna] had in place

'addressed only individual complaints and not group grievances like the one presented in the instant case.'" *Id*. at 1302 (quoting *Fortuna*, 354 NLRB at 212). We held that this finding was "not supported by substantial evidence," *id.* at 1303, as the record demonstrates that Fortuna's "open door" policy was well known, widely used, and effective in the past at addressing group grievances, *id*. at 1302–03. Noting that "the Board never quantified the weight to be given to any one of the *Quietflex* factors" we "grant[ed] the petition for review with respect to the Board's assessment of the May 11 protest and remand[ed] this issue for reconsideration by the Board." *Id*. at 1303.

On remand, the Board determined that the May 11 work stoppage was protected and that Fortuna violated the Act by suspending the participating employees. *Fortuna*, 2014 WL 2448880, at *10. As noted by the Board, we "affirmed the Board's findings and conclusions with respect to *Quietflex* factors 1, 2, 5, 6, 8, 9, and 10." *Id*. at *5. Pursuant to the remand, the Board determined how much weight to give to each of those factors. The Board concluded that "factors 1, 2, 6, 8, and 9 strongly support a conclusion that the employees were engaged in protected activity at the time they were suspended;" that "factor 5 ([Fortuna's] warning to employees) is entitled to little weight;" and "that factor 10 (the reasons for the discipline, here insubordination) does not weigh against protection." *Id*. at *6.

Given our concern with the Board's articulation of *Quietflex* factor three (interference with production), the Board undertook "to clarify this factor." *Id*. at *7. The Board explained that the "focus of the Board and the courts when applying this factor is on whether striking employees interfere with production or the provision of services by preventing *other* employees who are working from performing their

duties." *Id*. (emphasis in original). Applying the clarified test, the Board found that this factor "weighs strongly in favor of protection," as "there is no suggestion that the striking employees attempted to prevent other employees from working." *Id*.

With respect to *Quietflex* factor four (whether employees had an adequate opportunity to present grievances to management), the Board accepted our determination that employees had access to an established grievance procedure. Nevertheless, the Board "conclude[d] that this factor weighs slightly in favor of protection" given "the repeated assurances given the employees by Samayoa and other managers that they were trying to contact Coonley and Cook on the employees' behalf." *Id*. at *8. The employees' reasonable belief "that Coonley or Cook might yet meet with them and listen to their grievance…contributed to the employees' decision to persist in the work stoppage for as long as they did." *Id*.

With respect to *Quietflex* factor seven (access to established grievance procedure), the Board accepted our "determination that the employees had access to an established procedure through [Fortuna's] 'open door' policy for addressing group grievances" then gave "that factor due weight, but not decisive weight." *Id*. The fact that an established grievance procedure may cut against protection "does not mean…that the Act affords *no* protection to employees who engage in peaceful, nondisruptive, on-site work stoppages without first attempting to resolve their complaint through approved channels." *Id*. (emphasis in original).

"Considering all the relevant factors," the Board "conclude[d] that the work stoppage was protected for its

entire duration." *Id*. at \*10. This conclusion was based "primarily on the following factors: the purpose of the work stoppage was clearly protected; it was peaceful and did not disrupt the work of nonstriking employees; it was of a limited duration; and no employees remained on [Fortuna's] premises beyond their shift or attempted to seize [Fortuna's] property." *Id*. The Board determined that "[t]hese factors, taken together, substantially outweigh the significance of the availability of a grievance procedure in the circumstances of this case." *Id*. As the Board summarized its decision:

> [T]he employees were entitled to continue their on-site work stoppage for a reasonable period of time in a legitimate effort to meet with senior-level managers, despite the existence of an established grievance procedure and despite [Fortuna's] directive that the employees return to work or leave the Hotel, less than an hour after the peaceful work stoppage began and while employees were waiting to hear whether senior management would meet with them.

*Id*. Fortuna petitions for review of that order, and the Board has filed a cross-application for enforcement. For the reasons stated below, we will deny Fortuna's petition and grant the Board's cross-application.

## II.   ANALYSIS

This Court will "uphold the Board's legal determinations so long as they are neither arbitrary nor inconsistent with established law." *Tualatin Elec., Inc. v. NLRB*, 253 F.3d 714, 717 (D.C. Cir. 2001). "Determining whether activity is concerted and protected within the meaning of Section 7 is a task that 'implicates [the Board's] expertise in labor

relations.'" *Citizens Inv. Servs. Corp. v. NLRB*, 430 F.3d 1195, 1198 (D.C. Cir. 2005) (quoting *NLRB v. City Disposal Sys., Inc.*, 465 U.S. 822, 829 (1984)) (alteration in original). Thus, "[t]he Board's determination that an employee has engaged in protected concerted activity is entitled to considerable deference if it is reasonable." *Id.* "The Board's findings of fact, if supported by substantial evidence on the record considered as a whole, are conclusive even if a reviewing court on *de novo* review would reach a different result." *Id.*

### A. The Board's Explanation of Quietflex *Factor Three*

Under the third *Quietflex* factor, the Board is to consider whether the work stoppage interfered with production or deprived the employer access to its property. Explaining what it meant when it previously stated that "it is not considered an interference with production where employees do no more than withhold their own labor," *Fortuna*, 354 NLRB at 211, the Board on remand clarified that the proper focus is on "whether striking employees interfere with production or the provision of services by preventing *other* employees who are working from performing their duties," *Fortuna*, 2014 WL 2448880, at *7 (emphasis in original). Applying this standard, the Board found that factor three weighed in favor of protection. Fortuna contends that the Board erred by imposing an unworkable standard for the third *Quietflex* factor, and that this factor should weigh against protection because the withdrawal of the services of the striking employees affected the non-striking employees' ability to do their jobs. We disagree.

Fortuna's primary complaint is that the Board's clarified third factor "is completely impracticable in the service

industry." Fortuna Br. 32. Fortuna contends that unlike factory owners who can simply shut down a production line if part of the workforce strikes, employers in the service industry "must re-task non-striking employees away from their normal duties to ensure that the services normally performed by the striking employees are in fact carried out." *Id*. at 33. Thus, "at least in the service industry, the withdrawal of services by striking employees *necessarily* impacts the work performance of non-striking employees." *Id*. at 34 (emphasis in original).

While Fortuna's proposed industry distinction is certainly not frivolous, it is not sufficiently powerful to carry the day. The Board's clarification of the third *Quietflex* factor, made at the direction of this Court, is at least reasonable and therefore entitled to deference. The Board was not obligated to create special rules for the service industry. One possible purpose of a work stoppage, whether at a factory or at a hotel, is to exert economic pressure on the employer. By reassigning non-participating workers, Hilton management sought to mitigate the economic effects of the work stoppage employees withholding their own services. The stoppage impacted the work performance of other employees because Fortuna strove to maintain full service at full capacity. In this respect, Fortuna is like a factory owner who, after half of his workforce engages in a work stoppage, attempts to continue operating the factory at full capacity and reassigns other employees to keep every production line operating. Hilton management could have, in effect, "shut down a production line" by cancelling room and restaurant reservations and not accepting additional guests. This would have had an economic impact on Fortuna, but that would be because employees withheld their own services, not because employees interfered with the ability of other employees to do their jobs. In short, the Board's clarification of the third

factor is reasonable and the Board was not required to create different rules for the service industry.

Fortuna further contends that, even accepting the Board's clarification of the third factor, "there is ample evidence in the record that demonstrates that the employees engaged in the work stoppage adversely affected the working conditions of the non-striking employees beyond simply the withholding of their services." Fortuna Br. 34. Fortuna argues that the occupation of the employee cafeteria prevented non-participating employees from eating their lunch, forced Fortuna to reassign three separate Hilton managers to oversee the work stoppage, and resulted in some guest rooms being left uncleaned. *Id*. at 34–35.

Again, Fortuna's argument is not unreasonable, and we are not suggesting that the Board would have erred had it adopted it. However, neither are we convinced that the Board has erred in reaching the opposite conclusion. First, in contending that the "record" shows that other employees were prevented from eating lunch, Fortuna relies on testimony by Hilton managers that the presiding ALJ rejected as hearsay. *See* Hr'g Tr. 1548:4–11, *In re Fortuna Enters., L.P.* (NLRB), No. 31-CA-27837, May 13, 2008. Based on the admissible evidence, the Board reasonably determined that Fortuna "did not present the testimony of a single employee that the work stoppage interfered with their ability to use the cafeteria." *Fortuna*, 2014 WL 2448880, at *6 n.19. Second, Fortuna made the decision to assign three separate Hilton managers to oversee the work stoppage. "Whatever losses [Fortuna] sustained…were caused by its own response to the work stoppage, not by the work stoppage itself." *Accel, Inc.*, 339 NLRB 1052, 1053 (2003). Third, the Board reasonably determined that "although [Fortuna] contends that there were some rooms that were not cleaned, it does not assert that it

was unable to provide a clean room to any guest." *Fortuna*, 2014 WL 2448880, at *6 n.19. In sum, while the record "shows that the work stoppage did disrupt some of Hilton's operations," *Fortuna*, 665 F.3d at 1302, it does not compel a finding that the work stoppage interfered with the provision of services by other employees in the relevant sense. We hold that the Board's clarification of *Quietflex* factor three and its application thereof were reasonable and supported by substantial evidence.

### B. The Board's Analysis of Quietflex *Factors Four and Seven*

Under the fourth and seventh *Quietflex* factors, the Board is to consider whether employees had adequate opportunities to present grievances to management, and whether employees were represented or had an established grievance procedure. Analyzing these factors in its 2009 order, the Board erroneously concluded that the procedure Hilton had in place "addressed only individual complaints and not group grievances." *Fortuna*, 354 NLRB at 212. We found that conclusion unsupported by the record, and remanded the matter to the Board to reconsider these factors in light of our holding that the employees had access to Hilton's "open door" policy, which served as "an established procedure for handling 'group grievances.'" *Fortuna*, 665 F.3d at 1302. On remand, the Board found that factor four (opportunity to present grievances to management) weighs slightly in favor of protection given "the context of the repeated assurances given the employees by Samayoa and other managers that they were trying to contact Coonley and Cook on the employees' behalf." *Fortuna*, 2014 WL 2448880, at *8. The Board gave factor seven (existence of established grievance procedure) "due weight, but not decisive weight." *Id.* The Board concluded that the existence of an established grievance

procedure is but one factor in the analysis, which may be outweighed by competing factors. *See id.*

Fortuna contends that the Board erred in its analysis of factors four and seven, and the Board failed to give proper weight to the Hilton's "open door" policy. As Fortuna argues, "[b]ecause an established grievance procedure allows employees to exercise their Section 7 rights without infringing upon the employer's private property rights, the existence of such a grievance procedure weighs heavily against protecting an on-site work stoppage." Fortuna Br. 24. Fortuna points to *Cone Mills Corp. v. NLRB*, 413 F.2d 445 (4th Cir. 1969), and *Cambro Manufacturing Co.*, 312 NLRB 634 (1993), as examples of cases where "on-site work stoppages were held *not* to be protected in large part because the employees failed to take advantage of an effective existing grievance procedure." Fortuna Br. 25 (emphasis in original). Fortuna maintains that the employees could have addressed their concerns through availing themselves of the open door policy, or through an off-site strike; either action would have addressed their concerns while respecting the private property interests of Fortuna. Fortuna further contends that the Board erred when it concluded that factor four weighed in favor of protection. In considering this factor, the Board relied on the assurances by management that Coonley or Cook might speak with the gathered employees. This, Fortuna argues, contradicts our statement that Fortuna "had no obligation to inform the employees in the cafeteria that it would hear and consider their concerns in the future." *Fortuna*, 665 F.3d at 1302.

Fortuna's argument does not succeed. The Board addressed the terms of the remand and came to a reasoned conclusion that other "factors, taken together, substantially outweigh the significance of the availability of a grievance

procedure in the circumstances of this case." *Fortuna*, 2014 WL 2448880, at \*10. Nothing in the National Labor Relations Act, the *Quietflex* test, or judicial and Board opinions analyzing on-site work stoppages mandates that the existence of an alternative group grievance procedure prevails over the other *Quietflex* factors. On remand, the Board carefully distinguished *Cone Mills* and *Cambro*, *id*. at \*9, showing that the existence of an established grievance procedure was not decisive in those cases, but that "the tribunals relied on a combination of factors in concluding that the work stoppages at issue were unprotected," *id*. at \*8.

It is true that management "had no obligation to inform the employees in the cafeteria that it would hear and consider their concerns in the future." *Fortuna*, 665 F.3d at 1302. The Board's consideration of factor four, however, was not premised on management's failure to notify the employees "that a meeting with senior managers was not immediately possible" or failure to offer "a future opportunity to meet." *Id*. It was premised on the repeated assurances by Samayoa and other managers that they were reaching out to Coonley and Cook. The Board reasonably determined that "[t]he employees thus reasonably believed that Coonley or Cook might yet meet with them" and this "belief demonstrably contributed to the employees' decision to persist in the work stoppage for as long as they did." *Fortuna*, 2014 WL 2448880, at \*8. This conclusion does not contradict anything in our prior opinion, and there is substantial evidence in the record demonstrating that Hilton management repeatedly assured the gathered employees that there were ongoing efforts to reach Coonley and Cook. *See id*. at \*1–\*3. While Hilton management had no affirmative obligation to promise a future meeting (or inform employees that there would be no such meeting), once Hilton management induced the gathering employees to stay in the cafeteria with the

implication that a meeting was possible, this inducement may favor protection. The Board complied with our remand, and came to a reasoned conclusion supported by substantial evidence, in its analysis of factors four and seven.

### C.     Fortuna's Remaining Challenges to the Board's Decision

In its earlier 2009 order, "the Board never quantified the weight to be given to any one of the *Quietflex* factors." *Fortuna*, 665 F.3d at 1303. Since the Board found that none of the *Quietflex* factors weighed against protection, the Board found no need to assign any particular weight to each factor. Having held that the Board's analysis of factors three, four, and seven was inadequate, we remanded the matter to the Board to analyze and weigh all the factors in a manner consistent with our opinion. Fortuna contends that the Board erred in weighing these factors, arguing that each factor does not weigh strongly in favor of protection. We disagree.

Fortuna contends that "the Board erred by rebalancing the *Quietflex* factors in a manner that is plainly result-driven." Fortuna Br. 36. Fortuna cites Board Member Johnson's concurring opinion, which states that the *Quietflex* "test is fraught with difficulty for remand purposes." *Fortuna*, 2014 WL 2448880, at *12 n.3 (Johnson, concurring). As Member Johnson stated:

> An obvious problem posed by reweighting factors under any multifactor test, much less a 10 factor one, after a case has been remanded to us is the susceptibility to results-oriented analysis. In other words, colloquially speaking, the Board's reweighting the factors to achieve the same result may seem to the impartial

> observer more like some analytical version of
> Whac-A-Mole than reasoned decisionmaking.

*Id*. Fortuna further notes that this Court, in remanding to the Board, held that the "apparently decisive consideration" underlying the Board's 2009 order (the finding that there was not an effective group grievance procedure) was not supported by substantial evidence. *Fortuna*, 665 F.3d at 1302. Fortuna argues that the Board erroneously weighed other factors to overcome the fact that the evidence does not support the "decisive consideration" of its prior opinion, in an example of "result-driven decision-making." Fortuna Br. 19.

Member Johnson's concerns about the nebulousness of a ten-factor balancing test may be well-taken. Balancing tests in general are susceptible to results-driven application. As this Court stated previously, "the sort of multi-factor balancing 'test' suggested in *Quietflex* may be incapable of predictable application." *Fortuna*, 665 F.3d at 1300. However, as we did before, "we shall assume [the *Quietflex* test's] validity." *Id*. While *Quietflex* may be subject to abuse, the record does not demonstrate that the Board abused the test in this case. The fact that the Board reaffirmed its prior decision does not mean that its analysis was results-driven. The Board's weighing of the remaining *Quietflex* factors was reasonable and supported by substantial evidence.

In challenging how the Board specifically weighed each remaining *Quietflex* factor, Fortuna largely repackages its prior, unsuccessful arguments regarding the Board's analysis of those factors. "When there are multiple appeals taken in the course of a single piece of litigation, law-of-the-case doctrine holds that decisions rendered on the first appeal should not be revisited on later trips to the appellate court." *Crocker v. Piedmont Aviation, Inc.*, 49 F.3d 735, 739 (D.C.

Cir. 1995). When this matter was previously before this Court, Fortuna challenged the Board's analysis of nine of the ten *Quietflex* factors. With the exceptions noted above, we rejected Fortuna's arguments without much comment. *See Fortuna*, 665 F.3d at 1301. There was "nothing to…[Fortuna's] arguments against the Board's application of [those] *Quietflex* factors" then, and there is nothing to them now. *Id*. We will thus deny Fortuna's petition for review and grant the Board's cross-application for enforcement.

## III. CONCLUSION

When this matter was previously before this Court, we issued a limited remand directing the National Labor Relations Board to clarify one factor of the Board's ten-factor balancing test, re-analyze two factors in light of our holding that Fortuna had an established group grievance procedure, and weigh all of the factors to determine whether the employees' work stoppage remained protected under the National Labor Relations Act. The Board complied and issued a reasonable order, supported by substantial evidence, concluding that the May 11 work stoppage was protected and Fortuna's suspension of participating employees violated the Act. We deny Fortuna's petition for review and grant the Board's cross-application for enforcement.

*So ordered.*